Clifford E. DUNCAN and Gayle Duncan, Respondents,

v.

ANDREW COUNTY MUTUAL INSURANCE COMPANY, Appellant.

No. WD 34280.

Missouri Court of Appeals, Western District.

Dec. 13, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 31, 1984.

Application to Transfer Denied March 20, 1984.

Dan Hale, St. Joseph, for appellant.

Ronald E. Taylor, St. Joseph, for respondents.

Before SOMERVILLE, P.J., and SHANGLER and MANFORD, JJ.

SOMERVILLE, Presiding Judge.

Plaintiffs, husband and wife, filed a two count petition against defendant, a county mutual insurance company organized and existing under Chapter 380, RSMo 1978.

A policy of insurance issued by defendant to plaintiffs insuring certain property of the latter against loss by theft contained

a "rider" effective March 1, 1980, providing additional theft coverage for approximately 10,000 bushels of soybeans and certain tools and supplies located on premises described as the "Heck Farm".[1] By way of Count I, plaintiffs sought judgment against defendant under the policy of insurance (and rider) for the alleged theft of "approximately 5500 bushels" of soybeans and certain tools and supplies from the "Heck Farm" sometime between May 26, 1980, and July 2, 1980, which loss defendant refused to pay. Parenthetically, no issue is raised as to performance by plaintiffs of all conditions precedent. By way of Count II, plaintiffs sought judgment for damages (actual and punitive) against defendant in tort predicated on defendant's alleged bad faith refusal to pay the theft loss.

Prior to trial, the lower court sustained defendant's motion to dismiss Count II of plaintiffs' petition for failure to state a claim or cause of action and, in doing so, stated in its order "that the tort of bad faith in first party claims against insurance companies has not been recognized in Missouri." Count I of plaintiffs' petition, tried to a jury, resulted in a nine man verdict in favor of plaintiffs and against defendant in the sum and amount of $34,377.50 plus interest thereon at the rate of 9% per annum from July 2, 1980. Defendant appealed from the adverse judgment rendered against it on Count I of plaintiffs' petition and plaintiffs cross-appealed from the order of the trial court dismissing Count II of their petition. This court consolidated the appeals for purposes of appellate review.

This opinion first addresses defendant's appeal from the adverse judgment rendered against it on Count I of plaintiffs' petition. Defendant, in seeking redress on appeal, relies on five points of alleged error. The first point being that the trial court erred in giving Instruction No. 6, plaintiffs' verdict director, because it failed to submit a disputed issue of fact, i.e. whether plaintiffs owned any soybeans in storage on the "Heck Farm" which were the subject of the alleged theft. This point is deemed dispositive of the appeal. Two of the remaining four points, error in overruling defendant's objections to certain interrogatories and error in permitting plaintiff Clifford Duncan at trial to testify contradictory to answers he gave to interrogatories and questions put to him during the taking of his deposition, are deemed to be utterly devoid of any merit and, moreover, rendered moot by disposition of defendant's first point. The remaining two points, error in overruling objections to certain statements made by counsel for plaintiffs to the jury panel on voir dire and in overruling objections to certain questions put to one of plaintiffs' witnesses on direct examination, will not be addressed as they deal with matters unlikely to occur on retrial.

In order to put defendant's first point in proper perspective it is necessary to set forth plaintiffs' verdict director in conjunction with reference to certain portions of the respective pleadings and evidence introduced at trial.

Plaintiffs' verdict director, marked Instruction No. 6, given by the trial court at the request of plaintiffs, reads as follows:

"Your verdict must be for plaintiffs if you believe:

First, defendant issued its policy to plaintiffs on soybeans and equipment covering loss due to theft, and

Second, such property was damaged by theft."

Said instruction purported to be a modification of MAI 31.09 (New 1978).[2]

---

1. Additional personal property not involved in this litigation was also covered by the "rider".

2. MAI 31.09 is captioned "[1978 New] Verdict Directing—Insurance Policy on Property", and reads as follows:

   "Your verdict must be for plaintiff if you believe:

   First, defendant issued its policy to plaintiff on (here describe property) covering loss due to (here describe applicable coverage, e.g., fire, collision, or windstorm), and
   Second, such property was damaged by (here insert applicable coverage), and
   Third, the policy was in force on the date of such loss.

In paragraph 6 of Count I of their petition plaintiffs, albeit in a somewhat inept manner, alleged ownership of "approximately 5500 bushels" of soybeans (and other personal property of minimal value) at the time of the alleged theft. Defendant, in its answer, denied the allegations contained in paragraph 6 of Count I of plaintiffs' petition. The general rule is that one asserting a cause of action under a policy of insurance on property must aver ownership at the "time of loss". *Hayward v. Fidelity-Phoenix Ins. Co.*, 285 S.W. 144, 147 (Mo.App.1926), citing *Gustin v. Concordia Fire Ins. Co.*, 90 Mo.App. 373, 376 (1899).

In addition to formally denying plaintiffs' ownership of approximately 5500 bushels of soybeans (and other personal property) as alleged in paragraph 6 of Count I of plaintiffs' petition, defendant, in response to a certain interrogatory submitted by plaintiffs, stated that it refused to pay plaintiffs for approximately 5500 bushels of soybeans (and other personal property) allegedly stolen from the "Heck Farm" between May 26, 1980, and July 2, 1980, because plaintiffs did not own any soybeans at the time which were the subject of the alleged theft.

Whether plaintiffs owned any soybeans in storage on the "Heck Farm" at the time of the alleged theft was a hotly contested issue of fact throughout the trial. Plaintiffs, according to plaintiff Clifford Duncan, placed approximately 17,000 bushels of soybeans in storage in 1979 immediately following harvest of their 1979 soybean crop. Approximately 6,000 bushels of the soybeans immediately heretofore referred to were placed in storage in 1979 in a bin located on premises known as the "Vaughn Farm". Approximately 11,000 bushels of the soybeans heretofore referred to were placed in storage in 1979 in two bins located on the "Heck Farm".

Plaintiff Clifford Duncan testified on direct examination that they started hauling and selling the soybeans stored on the "Vaughn Farm" in early January of 1980; that most, if not all, of the soybeans stored on the "Vaughn Farm" were sold before they started hauling and selling any soybeans stored on the "Heck Farm". He further testified that he started hauling and selling soybeans out of bins on the "Heck Farm" during the early part of April, 1980. He quit hauling and selling soybeans which had been stored on the "Heck Farm" during the latter part of April, 1980. His 1980 "farm records" disclosed sales of approximately $26,981.64 worth of beans during the period of time immediately heretofore mentioned; said 1980 "farm records" failed to disclose any sales of soybeans in 1980 prior to the period of time heretofore mentioned. Clifford Duncan further testified that on or about May 26, 1980, he checked the bins on the "Heck Farm" and at that time there were approximately "6000" bushels of soybeans left in the largest bin. Clifford Duncan next checked the bins on the "Heck Farm" on or about July 2, 1980, at which time he discovered that the locks on the bins had been cut, soybeans had been spilled on the ground, all the soybeans had been removed, and certain items of personal property were missing. Plaintiffs filed a proof of loss with defendant claiming that 5,446 bushels of soybeans, along with certain items of personal property, had been stolen. During the periods of time in question, the price of soybeans on the local market averaged approximately $6.25 per bushel.

Whether or not plaintiffs owned any soybeans in storage on the "Heck Farm" at the time of the alleged theft became a volatile issue of fact by reason of certain evidence adduced from plaintiff Clifford Duncan on cross-examination, coupled with

---

* [unless you believe plaintiff is not entitled to recover by reason of Instruction Number —— (here insert number of affirmative defense instruction)]."

The "Notes on Use" appended thereto read as follows:

"* Add if affirmative defense is submitted. For example MAI 32.24."

That the policy of insurance (and rider) issued by defendant to plaintiffs was in force on the date of the alleged theft is not disputed in the instant case.

certain evidence introduced by defendant on direct examination by witnesses called on its behalf. On cross-examination, plaintiff Clifford Duncan admitted that when his deposition was taken he testified that according to his "record book" no soybeans were hauled or sold from the "Vaughn Farm" during 1980. He also admitted on cross-examination that certain checks totaling $28,402.55 for soybeans issued by Far Mar Co, during January 28, 1980 to March 31, 1980, named his brother, Steven Duncan, as payee. Clifford Duncan further testified that the aforementioned checks were cashed, rather than deposited, and that he (plaintiff Clifford Duncan) received all the proceeds therefrom, to-wit, $28,-402.55 in cash. He further testified that his brother owned no soybeans at the time, and that sales of soybeans totaling $28,-402.55 were not entered in his 1980 "farm record book" or reported on his 1980 Federal and State income tax returns. Plaintiff Clifford Duncan attempted to justify these discrepancies by explaining the method in which he prepared his 1980 "farm record book" and by pointing out that he reported a loss on his 1980 Federal and State income tax returns in excess of the sum of $28,-402.55. The record fails to disclose whether plaintiffs ever amended their 1980 tax returns. In presenting its case, defendant offered into evidence the aforementioned checks totaling $28,402.55 along with evidence that none were ever deposited in bank accounts belonging to plaintiffs.

■ Beyond the pale of any and all doubt, the aforementioned evidence adduced by defendant both on cross and direct examination raised a highly controverted and disputed issue of fact, i.e. did plaintiffs own and have any soybeans in storage at the "Heck Farm" which were the subject of the alleged theft reported to defendant and which they claim were covered by the "rider" to the policy of insurance issued by defendant. This does not mean to say that plaintiffs failed to make a submissible case. It does mean to say, however, that under all the evidence whether plaintiffs owned approximately 5,400 bushels of soybeans in storage at the "Heck Farm" which were the subject of the alleged theft was a disputed issue of fact for the jury to resolve. Moreover, the evidence introduced by defendant with respect thereto on both cross and direct examination threw a pall of suspicion on the alleged theft of the other items of personal property also put in issue by the pleadings.

Plaintiffs' verdict director, Instruction No. 6, supra, must now be analyzed in light of the foregoing pleadings and evidence. Historically, the quintessential role of juries in this state has been to resolve disputed issues of fact. The advent of MAI did not change their historic duty and prerogative. In MAI, p. XXXI, under the caption "How To Use This Book", the continuing duty of juries to do so is pithily emphasized: "The jury is impaneled to decide disputed issues of fact. The failure to instruct on every issue has been error, and it continues to be error." This same admonition appears in identical terms in MAI (Second Edition), p. XLIX. It is repeated, in essence, in MAI (Third Edition), p. XCIV, in more pragmatic terms: "[I]t may be necessary to modify an instruction to submit an issue which is in dispute in your case but which is usually not disputed and thus is not submitted by the approved MAI. For example, none of the motor vehicle verdict directors hypothesize that the defendant was driving the vehicle at the time of the collision because this matter is usually not in dispute. However, in a hit and run situation, where the defendant denies he was driving the vehicle that hit plaintiff, the verdict director must be modified to include this issue." The principle heretofore enunciated finds judicial expression in a number of cases following the adoption of MAI. In *Thompson v. Gray*, 415 S.W.2d 299, 305 (Mo.App.1967), the court held that "a verdict-directing instruction must still submit those facts which must be proved to authorize recovery, *when they are in issue*." (emphasis added) Other cases subsequent to the adoption of MAI have addressed the matter in terms of error in assuming controverted or disputed facts in a verdict director. *Price v. Sei-*

*dler,* 408 S.W.2d 815 (Mo.1966) is a case in point. In *Price,* the Supreme Court, although holding that the verdict director in controversy did not assume any issuable facts, observed as follows: "Several cases are cited as holding that assumptions of issuable facts are improper; these all arose under our former practice on instructions, *but such assumptions are still improper.*" Id. at 824. (emphasis added) Another case in point is *Welch v. Hyatt,* 578 S.W.2d 905, 913–14 (Mo. banc 1979), where the obtaining principle was expressed in the following terms: "While the general principle has been and is that an instruction assuming controverted facts is error, the facts of each case must be inquired into. If close scrutiny of the instruction demonstrates that it is calculated to lead the jury to believe assumed disputed facts the instruction suffers from the infirmity of the principle."

Plaintiffs' verdict director, by failing to submit to the jury the issue of ownership, patently assumed a highly controverted issue of fact permeating the entire case—whether plaintiffs owned any soybeans and other personal property at the time of the alleged theft covered by the rider to the policy of insurance issued by defendant. For this reason, plaintiffs' verdict director was inherently prejudicial and the judgment rendered in their favor and against defendant on Count I of plaintiffs' petition must be and hereby is reversed and the cause of action thereon remanded for a new trial.

This opinion now addresses plaintiffs' cross appeal alleging error on the part of the trial court in dismissing Count II of their petition prior to trial for failure to state a claim or cause of action. Resolution of this issue looks to the pleading and is not determined in retrospect on the basis of the evidence introduced at trial.

■ In this state the tort of bad faith is recognized as a viable theory under which an insured may obtain damages against an insurer due to the latter's bad faith in not effecting settlement of a third party claim within the limits of coverage afforded by a

policy of liability insurance. See *Zumwalt v. Utilities Ins. Co.,* 360 Mo. 362, 228 S.W.2d 750 (1950). The apical question on appeal is whether the tort of bad faith is applicable to a first party claim by an insured against an insurer who has refused to pay a loss under a policy of property insurance. The question posed has not heretofore been directly answered in this state.

■ Admittedly, a number of jurisdictions have extended the tort of bad faith originally conceived to give relief in third party claim situations to first party claim situations. See, e.g.: *Gruenberg v. Aetna Ins. Co.,* 9 Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032 (banc 1973); *Noble v. National American Life Ins. Co.,* 128 Ariz. 188, 624 P.2d 866 (banc 1981); and *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978). On the other hand, a respectable body of authority, although recognizing the tort of bad faith in frame of reference of third party claims, has refused to extend the tort of bad faith to first party claims by insureds against insurers under policies of property and related insurance. Some have done so by refusing to imbue the tort of bad faith as originally conceived with such elasticity as to be applicable to first party claims by insureds against insurers under property and related types of insurance. By way of explication, an insurer's right to control settlement and litigation under a policy of liability insurance creates a fiduciary relationship between insurer and insured. Concomitantly, an insurer owes a duty to exercise good faith in evaluating and negotiating third party claims against its insured and may be held liable in tort (commonly referred to as the tort of bad faith) by its insured for a third party judgment in excess of the policy limits in the event it fails to exercise good faith in the performance of its fiduciary obligation. It is the existence of this fiduciary relationship between insurer and insured under a policy of liability insurance, beyond and apart from any subsisting implied covenant of good faith and fair dealing on the part of an insurer

under a policy of insurance, which exposes an insurer to liability in tort for failure to exercise good faith in evaluating and negotiating third party claims against an insured. The postulate for this fiduciary relationship is notably absent in claims by an insured against an insurer under policies of property and related types of insurance. Such claims are not controlled by the insurer to the exclusion of the insured nor is the specter of a judgment against an insured in excess of coverage a present danger if an insurer fails to exercise good faith. In first party claims by insureds against insurers under policies affording coverage for loss or damage to property and related types of insurance, the parties occupy a contractually adversary or creditor-debtor status as opposed to standing in a fiduciary relationship. See, e.g.: *Baxter v. Royal Indemnity Co.*, 285 So.2d 652 (Fla.App. 1973); *Lawton v. Great Southwestern Fire Ins. Co.*, 118 N.H. 607, 392 A.2d 576 (1978); and *Farris v. U.S. Fidelity & Guaranty Co.*, 284 Or. 453, 587 P.2d 1015 (banc 1978).

■■ A course has been charted, by way of dicta, in *Craig v. Iowa Kemper Mut. Ins. Co.*, 565 S.W.2d 716, 723–24 (Mo. App.1978), for rejecting the tort of bad faith with respect to first party claims in accord with the legal rationale expounded in the cases immediately heretofore cited:

> "The cause of action in tort for breach of the obligation of fair dealing presupposes an insurer and insured in a subsistent fiduciary relationship.... The mere relationship of insurer and insured does not import an obligation of trust. Rather, in the absence of special circumstances, the relation between the parties to a contract of insurance is that of debtor and creditor.... The fiduciary duty of an insurer for good faith rests on the reservation of exclusive right to contest or negotiate the claim of liability brought against the insured, and so withhold from the insured the right to settle without consent of the insurer.... The duty to deal in good faith, therefore, does not arise from consent and contract but from the nature of the relationship.... There can be no tort in the absence of a duty, and no duty of good faith by an insurer to an insured in the absence of a fiduciary relationship between them.... We do not say whether a bad faith refusal by an insurer of a benefit owed directly to an insured on a policy can support an action in tort, but only that the tenor of our law suggests otherwise."

Other jurisdictions have rejected extension of the tort of bad faith to first party claims on a theory of preemption where regulatory safeguards or procedural remedies have been legislatively enacted to protect insureds from abuses by insurers in the disposition of first party claims. See, e.g.: *Leonard v. Firemen's Ins. Co. of Newark, N.J.*, 100 Ga.App. 434, 111 S.E.2d 773 (1959); *Spencer v. Aetna Life & Cas. Ins. Co.*, 227 Kan. 914, 611 P.2d 149 (1980); *Debolt v. Mutual of Omaha Ins. Co.*, 56 Ill.App.3d 111, 13 Ill.Dec. 656, 371 N.E.2d 373 (1973); *Lawton v. Great Southwestern Fire Ins. Co.*, supra; and *D'Ambrosio v. Pa. Nat'l Mut. Cas. Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981).

Section 375.420, RSMo 1978[3], enacted by the General Assembly of this state is the linchpin for subscribing to the theory of preemption as it provides a statutory procedural remedy in favor of insureds for redress of abuses by insurers in disposing of

---

**3.** Section 375.420, RSMo 1978, captioned "Vexatious refusal, to pay claim damages for, exception", reads as follows:

"In any action against any insurance company to recover the amount of any loss under a policy of automobile, fire, cyclone, lightning, life, health, accident, employers' liability, burglary, theft, embezzlement, fidelity, indemnity, marine or other insurance except automobile liability insurance, if it appears from the evidence that such company has refused to pay such loss without reasonable cause or excuse, the court or jury may, in addition to the amount thereof and interest, allow the plaintiff damages not to exceed twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars and a reasonable attorney's fee; and the court shall enter judgment for the aggregate sum found in the verdict."

first party claims under policies of property and related insurance. It is a clear expression of public policy on the subject vitiating any need for extending the tort of bad faith to first party claims. To hold otherwise, would, for all practical purposes, constitute a repeal of § 375.420, supra, by judicial fiat due to the broader vista of damages envisioned under the tort of bad faith. Cognately, as pointed out by defendant and tacitly conceded by plaintiffs, the General Assembly of this state, as a matter of public policy, also saw fit to exempt county mutual insurance companies such as defendant from the operation of § 375.420, supra, by enacting § 380.060, RSMo 1978.[4] While this court does not profess to be privy to the collective, subjective thought process of the General Assembly in enacting § 380.060, supra, it empirically notes the close knit, neighborhood endeavor, localized control, and sui generis nature of insuring entities which, historically, were legislatively responded to by enactment of special statutes regarding county mutual insurance companies. By force of logic, extension of the theory of preemption augurs in favor of rejection of the tort of bad faith with respect to first party claims against county mutual insurance companies such as defendant organized under Chapter 380, RSMo 1978, notwithstanding their exemption from the statutory procedural remedy created by § 375.420, supra. The theory of preemption aside, this court also subscribes to the view, supra, that the sustaining logic and rationale for the tort of bad faith in the context of an insurer's disposition of third party claims under a policy of liability insurance is non-existent in first party claims regardless of an insurer's organizational or structural roots.

**4.** Section 380.060, RSMo 1978, captioned, "Companies exempt from what laws", reads as follows:

"All companies incorporated under the provisions of sections 380.040 to 380.270 are hereby exempted from the operation of all other general statutes of this state in regard to insurance, but such companies shall be subject, as far as applicable, to the provisions of chapter 351, RSMo."

In sum, this court rejects extension of the tort of bad faith applicable to third party claims in the context of liability insurance to first party claims in the context of property and related insurance on both principles heretofore discussed—(1) inherent contextual differences distinguishing and separating the two types of claims and (2) legislative preemption.

The judgment of the trial court in favor of plaintiffs and against defendant on Count I of plaintiffs' petition is reversed and the cause thereon is remanded for a new trial; the order of the trial court dismissing Count II of plaintiffs' petition for failure to state a claim or cause of action is affirmed.

All concur.

See *Sappington v. St. Joseph Town Mut. Fire Ins. Co.*, 77 Mo.App. 270 (1898), and *Schmidt v. Central Mut. Ins. Ass'n*, 153 S.W.2d 99 (Mo.App. 1941), holding that defendant insurers therein, who were favored by statutory provisions comparable to § 380.060 applicable to county mutual insurance companies, were exempt from the provisions of then existing "vexatious delay" statutes, now § 375.420, RSMo 1978.