Steven Anthony GANAWAY, assignee of
Kenneth L. McDonald, trustee in bank-
ruptcy for Craig Alan Scott, Plaintiff–
Appellant,

v.

SHELTER MUTUAL INSURANCE COM-
PANY, a Missouri corporation,
Defendant–Respondent.

No. 16198.

Missouri Court of Appeals,
Southern District,
Division Two.

July 30, 1990.

Motion for Rehearing or Transfer
Denied Aug. 16, 1990.

Application to Transfer Denied
Oct. 16, 1990.

Thomas Strong, Jeffrey W. Bates, Strong & Associates, P.C., Springfield, for plaintiff-appellant.

Rodney E. Loomer, Michael J. Patton, M. Sean McGinnis, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for defendant-respondent.

HOGAN, Judge.

Steven A. Ganaway (plaintiff) brought this action against Shelter Mutual Insurance Company (Shelter), a liability insurance carrier, seeking to recover damages on the ground that Shelter refused, in bad faith, to settle a claim against its insured and thereby became liable to its insured for a judgment recovered against him in excess of the policy limits. The suit was commenced on August 27, 1987. After the parties had completed their discovery and had indulged in a good deal of legal maneuvering, both moved the court for summary judgment pursuant to Rule 74.04. The court denied the plaintiff's motion for summary judgment and entered a summary judgment for Shelter. The plaintiff has appealed from both orders.

By way of very general background, it may be said that the appeal involves an automobile accident which occurred in Boone County, Missouri, on November 15, 1981. The plaintiff, who was a passenger in the insured's automobile, was pitifully injured. He has been diagnosed as being permanently quadriplegic. At the time the accident occurred, the plaintiff was 20 years of age. There is no doubt that the driver of the automobile in which plaintiff was riding was at fault; the focus of the controversy before us is the amount for which Shelter is liable as insurer of the driver of that vehicle. Various aspects of the dispute which arose out of the accident have been litigated on three occasions. The parties have accumulated a voluminous record, a great deal of which has been presented on this appeal. As in other cases where much testimony and innumerable exhibits have been introduced, we will confine ourselves to a recitation of those facts and

consideration of those issues essential to a proper disposition of the appeal. See *State ex rel. Ellsworth Freight Lines, Inc. v. State Tax Commission of Missouri*, 651 S.W.2d 130, 133 (Mo. banc 1983), *cert. denied*, 465 U.S. 1001, 104 S.Ct. 1019, 79 L.Ed.2d 223 (1984); *Bloomfield Reorganized School Dist. No. R–14 v. Stites*, 336 S.W.2d 95, 97 (Mo.1960); *Logsdon v. Duncan*, 293 S.W.2d 944, 946[1] (Mo.1956). And while we bear in mind, as Shelter reminds us, that an order granting summary judgment will not be set aside on review if it is supportable on any theory, we also bear in mind that summary judgment is appropriate in the first instance only when no theory within the scope of the pleadings, depositions and affidavits filed would permit recovery and the moving party is entitled to judgment as a matter of law. Rule 74.04(c); *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 244 (Mo. banc 1984).

## I

### A

■■■ Preliminarily, it is appropriate to discuss briefly the "bad faith" doctrine upon which the plaintiff predicates his right to recover. A great deal has been written about the duty of a liability insurer to exercise good faith in considering an offer to compromise a claim against its insured, but it is a fair general statement of the rule that a liability insurer, having assumed control of the right to settle claims against the insured, may become liable in excess of its undertaking under the policy provisions if it fails to exercise good faith in considering offers to compromise the claim for an amount within the policy limits. Annot., 40 A.L.R.2d 168, 178–81 § 4 (1955).[1] The "bad faith" doctrine has been recognized and applied by our courts. *Zumwalt v. Utilities Ins. Co.*, 360 Mo. 362, 228 S.W.2d 750 (1950); *Dyer v. General American Life Ins. Co.*, 541 S.W.2d 702 (Mo.App.1976); *Landie v. Century Indemnity Company*, 390 S.W.2d 558 (Mo.App.1965); *McCombs v. The Fidelity and Casualty Co. of New York*, 231 Mo. App. 1206, 89 S.W.2d 114 (1935). As carefully pointed out in *Landie*, an insurer's duty to defend is distinct and different from its duty to settle a claim against its insured within its policy limits when it has a chance to do so. It is also clear that a "bad faith" action for refusal to settle sounds in tort, not in contract, *Zumwalt*, 360 Mo. at 373, 228 S.W.2d at 756, and requires a showing that the insurer acted in bad faith, rather than negligently. *Zumwalt*, 360 Mo. at 370, 228 S.W.2d at 753[2].

### B

As a further preliminary, the material terms of Shelter's policy should be noted. Part II of the policy provides automobile liability insurance. Paragraph 1 of Part II reads as follows:

"1. COVERAGE A—Bodily Injury Liability; COVERAGE B—Property Damage Liability—The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

A. Bodily injury sustained by any person;

B. Property damage sustained by any person;

caused by accident and arising out of the ownership, maintenance, or use of the described automobile or a non-owned automobile, and the Company shall de-

---

**1.** We forego general discussion of the "bad faith" doctrine. As we have said, a great deal has been written on the subject. See, e.g., 7C J. Appleman, *Insurance Law and Practice* §§ 4711, 4712, pp. 367–505 (Berdal Rev.1979); 14 Couch on Insurance 2d §§ 51.1–51.34, pp. 375–438 (Rev.ed. 1982); Annot., *supra*, 40 A.L.R.2d 168; A.L.R.2d Later Case Service supplementing Vols. 40–43 A.L.R.2d at p. 8 (1980). There is also a great deal of commentary on the subject. See R. Keeton, *Liability Insurance and Responsibility for Settlement*, 67 Harv.L.Rev. 1136 (1954)

(this is perhaps the classic discussion of the subject); see also Comment, *The "Set Up" Defense and the Comparative Fault Defense: New Wrinkles in Bad Faith Claims Against Insurers*, 45 Wash. & Lee L.Rev. 321 (1988); Comment, *Liability Insurers and Third–Party Claimants: The Limits of Duty*, 48 U.Chi.L.Rev. 125 (1981); Comments, *Excess Liability Suits—The Mounting Need for Strict Liability*, 13 St.Louis U.L.J. 292 (1968). We do not propose to comment upon the general law except to the extent necessary to resolve this appeal.

fend any suit alleging such bodily injury or property damage and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false, or fraudulent; but the Company may make such investigation or settlement of any claim ·or suit that it deems expedient."

The final sentence of paragraph B is supplemented by language found in Paragraph 8 of the Conditions of the policy, which in material part provides:

"... The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for such immediate medical or surgical relief to others as shall be imperative at the time of the accident."

It will be seen that although the policy language is not quite as restrictive as the language considered in *Zumwalt*, 360 Mo. at 368, 228 S.W.2d at 752, it obviously reserves the right to settle claims against the insured to the insurer itself. Such policy provisions are generally construed to reserve to the insurer the decision whether an offer to compromise a claim against the insured should be accepted. See Annot., *supra*, 40 A.L.R.2d at 170 § 1 and n. 1; 7 Am.Jur.2d *Automobile Insurance* § 383, p. 1118 (1980).

The policy also contains the following language under Section III, which provides automobile medical payments insurance:

"1. COVERAGE C—Medical Payments—The Company will pay all reasonable expenses which are incurred within one year from the date of accident for necessary medical, surgical, x-ray, and dental services, including prosthetic devices, and necessary ambulance, hospital, professional nursing and funeral services, for bodily injury caused by accident and sustained by:

\* \* \* \* \* \*

(b) Any other person while occupying (1) the described automobile while being used by the named insured or spouse or by any other person with the permission of the named insured or spouse, provided his actual operation or (if he is not oper-

ating) his actual use thereof is within the scope of such permission,

\* \* \* \* \* \*

The amount of any payment under this Coverage C to or on behalf of any person shall be applied toward the settlement of any claim or the satisfaction of any judgment for damages entered against any insured because of bodily injury to such person arising out of any accident to which bodily injury liability (Coverage A) applies."

## II

### A

Some further statement of the facts is necessary to an understanding of the case. Certain documents included in the legal file indicate that the accident out of which this case arose occurred on Sunday, November 15, 1981, about 5:30 A.M. in Boone County, Missouri. The site of the accident was along and either side of the eastbound lane of Interstate 70 about .6 miles east of its intersection with Interstate 40. The plaintiff and three other persons were riding in the insured vehicle, a 1980 Honda Accord. The driver of the automobile was Craig Alan Scott. Scott, Ganaway and the other two occupants of the Honda were acquainted; Scott and Ganaway were students at Central Missouri State University at the time. The four men had attended a basketball game at Warrensburg, and very early in the morning they had decided to return to Columbia, Missouri, where all four men lived. Scott was following a tractor-trailer unit being driven by one Walter Leroy Wigfield, and had made several attempts to pass the truck. Wigfield indicated that the Honda would pass him, then would slow down and the truck would pass the Honda. After this exchange had occurred several times, Scott attempted to pass the truck once more but went over onto the shoulder. Scott tried to recover control of his vehicle but it went into a spin and struck the tractor. The trailer was overturned; it slid down both eastbound lanes of Interstate 70. The Honda went

off the road on the right side. Two of the occupants were thrown from the car.

It is fair to say, as the plaintiff contends, that Shelter investigated the accident promptly and became aware of exposure to substantial risk almost at once. It is also apparent from the record that plaintiff's neck was broken in the accident and that Shelter was aware almost immediately that he had sustained that injury and had been diagnosed as quadriplegic.[2]

In his brief, the plaintiff clearly states that he bases his bad faith action on Shelter's refusal to settle his claim prior to February 15, 1984. Some discussion of the settlement negotiations between the plaintiff's attorney and Shelter's representatives is necessary. As noted, the accident occurred on November 15, 1981. By November 25, plaintiff—or someone on his behalf—had employed an attorney. By letter dated November 25, the attorney addressed Shelter's claims department, stating that he represented the plaintiff with respect to injuries plaintiff received in the accident. The burden of the letter was that counsel was anxious to "handle this on an amicable basis, to avoid long protracted negotiations."

Shelter responded promptly, acknowledging the attorney's representation of the plaintiff's interest. The claims adjuster asked to be advised when the attorney had received a medical report and hospital bills. The attorney also answered promptly, sending some of the plaintiff's medical bills and offering to make the plaintiff's medical records available. The attorney advised Shelter that his client's claim "appear[ed] to be a limits case" and asked that the policy limits be divulged. On January 8, 1982, Mr. Dwight McQuary, a claims supervisor employed by Shelter, advised plaintiff's attorney that "[o]ur limit for bodily injury is $50,000 per person."

On March 4, 1982, plaintiff employed two Springfield attorneys, Mr. Thomas G.

Strong and Mr. Mathew Placzek, to represent him. In circumstances not material here, his original attorneys withdrew in October 1982. A memorandum from Shelter's file indicates that on June 29, 1983, Mr. Placzek spoke with one of Shelter's claims supervisors on the telephone. The memorandum indicates that Mr. Placzek offered to settle plaintiff's claim for personal injuries "for [Shelter's] coverage." Mr. Placzek asked for an affidavit concerning the amount of Shelter's coverage and offered to execute a covenant not to sue.

It was at this point that the parties' dispute concerning Shelter's limits of liability first developed. McQuary and Placzek again conferred by telephone. McQuary's memorandum indicates he advised Placzek Shelter would pay $45,000 under its liability coverage. Placzek indicated he would not accept less than $50,000 and suggested that under the applicable law Shelter's limit was $50,000. Placzek offered to furnish Shelter with precedent to justify his position. For reasons not determinative of the merits of the appeal, the negotiations were suspended until October 1983. On October 27, 1983, Mr. Placzek again addressed Shelter by letter. The letter, submitted as plaintiff's Exhibit 7 in support of his motion for summary judgment, constitutes an elaborate formal demand for settlement of the plaintiff's claim against Shelter's insured. Paragraph 2 of the letter read as follows:

"2. You have stated that the $5,000.00 medical payments provisions, which had previously been paid to Steven Ganaway, should be deducted from the $50,000.00 policy limits. We have searched a specimen policy of Shelter Insurance Company for a provision which would support your contention and have found no such provision. If there is one contained in the policy issued to Hazel Scott, I would appreciate it if you would provide us with a copy of the same at your earliest convenience so that we

---

**2.** A report of the accident dictated November 17, 1981, apparently for Shelter's file, states that "... Steve Ganaway who lives at 6616 St. Charles Road, is 20 years old and is [sic] injuries are quite severe. Steve Ganaway sustained a broken vetebra [sic] and is reported to be the sixth vertebra down. He is presently paralzed [sic] from the shoulder down and the doctors prognosis is that he will remain so...."

might examine the same and make a reasoned decision regarding your contention. We have also examined the law in depth and find no Missouri decisions which support such an assertion of Shelter Insurance Company. If you have any cases to support your position, please advise us of the same."

On November 18, 1983, a representative of Shelter's claims department addressed a letter to Mr. Placzek advising him that the file on the accident had been reviewed by the "Home Office Claims Department." Shelter thereupon made an offer of settlement, as follows:

"... On the basis of their research, they have confirmed that we are entitled to the medical payments offset as provided in the policy. This of course means that we are willing to pay $5,000 under medical payments coverage and $45,000 under the liability coverage, which would exhaust our coverage. We would, of course, require a release in favor of Hazel Scott and Craig Scott. It also was determined that we are obligated to honor the lien at University of Missouri Medical Center. We agree that your lien would take precedence over the lien of the Missouri Department of Social Services.

The answer to the question you posed concerning the policy provision providing for the offset can be found under the Medical Payments Coverage on page 2 of the policy, in the last paragraph of Part 1, which reads as follows:

'The amount of any payment under this Coverage C to or on behalf of any person shall be applied toward the settlement of any claim or the satisfaction of any judgment for damages entered against any insured because of bodily injury to such person arising out of any accident to which bodily injury liability (Coverage A) applies.'

Please let us know if we shall be able to conclude a settlement of this claim in keeping with the requirements as above outlined."

On December 1, 1983, Mr. Placzek again addressed Shelter, outlining the settlement the plaintiff would be willing to accept. This letter contains the following paragraph:

"Based on the information provided in your letter of November 18, 1983, we cannot agree that there is only $45,000.00 remaining under the liability coverage section of the policy. We believe the offsetting provision of the policy contained in your letter would have effect only if the settlement value or judgment rendered in Steve's case was $55,000.00 or less. Since Steve's claim is worth several million dollars, we believe he is entitled to be paid in settlement the full $50,000.00 portion of the liability coverage and not one penny less. It might be that there are other provisions of the policy which amplify the quoted portion of the policy contained in your letter of November 18, 1983; however, we do not have a copy of the policy and have no way of obtaining a copy of the same. If you will furnish us with a copy of the policy and describe any other sections you claim compliment this provision, we will reconsider our position on this issue."

The letter also clearly stated that the plaintiff's offer of settlement would remain open until December 15, 1983. Shelter was also advised that this time limit would be extended if it needed further time to consider the plaintiff's offer of settlement.

Shelter replied to this communication on December 5, 1983, and renewed its offer of settlement outlined in its letter of November 18, 1983. On February 7, 1984, Shelter addressed Mr. Placzek, asking if he needed further verification of its limits of coverage; if so, Shelter would forward an affidavit. Mr. Placzek replied on February 13, advising Shelter that its verification of coverage became irrelevant when it took the position that the $5,000 paid pursuant to the medical payments coverage should be deducted from the applicable $50,000 liability coverage.

On January 12, 1984, the plaintiff filed suit against Shelter's insured and others in the Circuit Court of Boone County. This case was not immediately tried. On June

1, 1984, believing it should obtain a judicial declaration of its obligation under the policy, Shelter filed an action for a declaratory judgment in the Circuit Court of Boone County. We will not repeat the substance of the petition, but it is clear that Shelter sought construction of that part of its policy which provides that any payment under the medical payments coverage "shall be applied toward the settlement of any claim or the satisfaction of any judgment for damages entered against any insured because of bodily injury to such person arising out of any accident to which bodily injury liability (Coverage A) applies."

The declaratory judgment action was brought against the plaintiff and Shelter's insured. The trial court sustained a motion for summary judgment filed by the present plaintiff, who was a defendant in the declaratory judgment action. In its order or decree, the trial court declared:

> "(a) The $5,000.00 medical payment which defendant Scott [Shelter's insured] has made to defendant Ganaway does not reduce the $50,000.00 amount of liability coverage under plaintiff's insurance policy unless a verdict is rendered in an amount less than $55,000.00. A final declaratory judgment should be entered in favor of defendant Ganaway and against plaintiff with the costs taxed against the plaintiff."

This judgment was appealed, and on appeal our colleagues at Kansas City held that Shelter was obligated to pay medical expenses up to the $5,000 policy limit without impairment of or reduction in the liability coverage limit of $50,000. *Shelter Mut. Ins. Co. v. Ganaway*, 694 S.W.2d 521 (Mo. App.1985). After the Court of Appeals' mandate ran, Shelter tendered $50,000 in settlement of the plaintiff's claim against its insured. In addition, Shelter offered to pay the full amount of the medical coverage to or on behalf of plaintiff Ganaway. This offer was refused.

The personal injury suit, in which the present plaintiff was the plaintiff and the owner and driver of the tractor-trailer unit and Shelter's insured were defendants, was tried in the Circuit Court of Boone County from November 18, 1986, to December 5, 1986. On plaintiff's claim against the owner (or lessor) of the truck and the driver of the truck, the jury assessed zero per cent fault to the owner and the operator of the truck, ten per cent fault to plaintiff Steven Ganaway, and ninety per cent fault to Shelter's insured. On December 5, 1986, judgment in the amount of $4,050,000 was entered in favor of plaintiff and against Shelter's insured. On February 27, 1987, Shelter remitted $133,884.93, representing the limit of the insured's liability coverage plus interest on the judgment through February 27, 1987. Later, plaintiff received the $5,000 medical payment from Shelter.

After the plaintiff obtained his judgment against Scott, an involuntary petition was filed in the United States Bankruptcy Court for the Western District of Oklahoma, a Chapter 7 petition requesting that the defendant's insured be declared bankrupt and averring the existence of circumstances in which relief might be granted under the Bankruptcy Code. The insured's trustee in bankruptcy assigned the insured's bad faith claim to the plaintiff. The bankruptcy court specifically found the claim to be assignable. Thereafter, the present action was instituted. Other facts will be noted in the course of the opinion.

## B

■ At this point, we must restate the general issues tendered by plaintiff Ganaway on this appeal. He states in his brief that his bad faith action is based on Shelter's conduct prior to February 15, 1984, in insisting on the deduction or offset provided for under the "Medical Payments" coverage part of its policy. The plaintiff has argued at length that the trial court should have granted his motion for summary judgment, and we shall address that argument presently, but our first inquiry is whether it can be said, upon the record before us, that there is no theory within the scope of the pleadings, depositions, admissions and affidavits filed which would permit plaintiff Ganaway to recover in the bad faith action and Shelter is entitled to judgment as a matter of law. See Rule 74.04(c); *Zafft v.*

*Eli Lilly & Co.,* 676 S.W.2d at 244. In determining the propriety of entering a summary judgment for Shelter, we bear in mind that Rule 74.04 is similar to Fed.R. Civ.P. 56, and federal decisions construing Fed.R.Civ.P. 56 are persuasive in construing and applying Rule 74.04. *Elliott v. Harris,* 423 S.W.2d 831, 835 (Mo. banc 1968); *Cooper v. Finke,* 376 S.W.2d 225, 228[1] (Mo.1964). We also bear in mind that in *Zumwalt,* 360 Mo. at 370, 228 S.W.2d at 754, our Supreme Court held that "bad faith" is a state of mind, indicated by facts and circumstances, and is provable by circumstantial as well as direct evidence. The court also held that each case must stand upon its particular state of facts. We understand *Zumwalt* to hold that the existence of "bad faith," in the context with which we are concerned, is usually a question of fact.

## III

### A

*The "fairly debatable" issue.*

Shelter argues that it was entitled to judgment as a matter of law because the extent of its coverage presented a fairly debatable question of law, and it insulated itself from liability by obtaining a judicial construction of its policy prior to the trial of the negligence action. Our first inquiry is whether the extent of Shelter's coverage—its right to offset payments made under the medical payment coverage—was "fairly debatable."

The language with which we are concerned may, for easy reference, be reiterated. The policy states, in Part III, paragraph 1, subparagraph (b) that:

"The amount of any payment under this Coverage C [Medical payments] to or on behalf of any person *shall be applied toward the settlement of any claim or the satisfaction of any judgment for damages entered against any insured because of bodily injury to such person arising out of any accident to which bodily injury liability (Coverage A) applies.*" (Emphasis added.)

Shelter did, of course, file a declaratory judgment action on June 1, 1984, nearly three years after the plaintiff first made a claim under the bodily injury liability coverage of Shelter's policy. Our colleagues at Kansas City ruled against Shelter's contention that the clause quoted operates to reduce the limit of the insurer's exposure under bodily injury liability. The court stated, 694 S.W.2d at 522:

"... The contract merely says that medical payments are included in the payment fund available to settle bodily injury liability claims and to satisfy judgments entered against insureds on this account. The paragraph makes no mention of nor does it purport to reduce the actual limits of coverage which the policyholder has purchased...."

The court cited *MFA Insurance Co. v. Hollingshad,* 483 P.2d 330 (Okla.1971), a case to which Shelter had been a party, in support of its decision. It was further held that *Hamilton v. Slover,* 440 S.W.2d 947 (Mo.1969), did not aid Shelter in its contention. The plaintiff argues that because Shelter had previously litigated the construction of its policy in Oklahoma it cannot be said there was a genuine issue of material fact as to Shelter's good faith belief that its policy permitted the offset for which it contended.

■ There are precedents which hold, or indicate, that policy language similar to that quoted should be enforced according to its terms. See, e.g., *Caballero v. Farmers Insurance Group,* 10 Ariz.App. 61, 63, 455 P.2d 1011, 1014[2] (1969). We are aware that in some jurisdictions it has been held that a liability insurer may challenge "fairly debatable" questions without incurring the risk of a bad faith claim. See *Noble v. National Am. Life Ins. Co.,* 128 Ariz. 188, 190, 624 P.2d 866, 868[2][3, 4] (banc 1981); *Anderson v. Continental Insurance Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978). Even assuming, solely for the sake of argument, that the "fairly debatable" rule should be held to be the law of Missouri, the fair debatability of issues and damages as they appeared when Shelter refused the offers of settlement

would be regarded as fact questions. *Clearwater v. State Farm Mut. Auto. Ins.*, 161 Ariz. 590, 592–93, 780 P.2d 423, 425–26[1] (App.1989).

■ What Shelter asks us to hold is that the mere filing of a declaratory judgment action *to determine the construction of its own policy necessarily* insulates it against a bad faith claim. We reject that argument. See *Western Casualty & Surety Company v. Herman*, 405 F.2d 121 (8th Cir.1968). We reiterate our belief that the precedent by which we are bound holds that the existence of "bad faith" is usually a question of fact. *Zumwalt*, 360 Mo. at 370, 228 S.W.2d at 754. Whether Shelter's refusal to settle the plaintiff's claim within its proper policy limits was the result of a parsimonious attempt to settle the claim or, on the other hand, was the result of a "fairly debatable" question of the construction of the policy was, in our view, a question of fact.

## IV

Shelter has advanced a number of additional reasons why it is entitled to summary judgment in this case.

### A

■ It is first contended that there is no genuine issue of material fact as to the existence of a fairly debatable coverage question because the affidavit of one Joseph W. Duncan, filed by Shelter, was not controverted, and because Ganaway did not argue in the declaratory judgment action that Shelter's coverage argument was made in bad faith nor contend that its appeal in the declaratory judgment action was frivolous. We find these arguments unconvincing. Mr. Duncan's affidavit is lengthy, but in substance it amounts to a declaration that at all times during the pendency of the plaintiff's claim against its insured, it was Shelter's intention to act in good faith and to interpret its policy correctly. However, the "good faith" action is an action which involves a state of mind. *Zumwalt*, 360 Mo. at 370, 228 S.W.2d at 754. It has been consistently held that cases in which the underlying issue is one

of motivation, intent, or some other subjective fact are particularly inappropriate for summary judgment. *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir.1977); *Craft v. Economy Fire & Cas. Co.*, 572 F.2d 565, 573[6] (7th Cir.1978); 10A C. Wright, A. Miller and M. Kane, Federal Practice & Procedure, Civil 2d § 2730 (1983). The fact that the affidavit was not contradicted is not decisive in this case. Duncan's affidavit amounts to nothing more than his conclusion that Shelter was acting in good faith. The affidavit is very much like the affidavit considered in *Barnes v. York*, 526 S.W.2d 404 (Mo.App.1975), wherein the plaintiff's attorney alleged "that there was absolutely no defense to [plaintiff's] action." Our colleagues at St. Louis held such assertions were merely conclusions which could not support a summary judgment. As much can be said of Duncan's affidavit.

■ We further conclude that the plaintiff's failure to seek an award of attorney's fees or to ask for damages for a frivolous appeal in the declaratory judgment action does not demonstrate that there was no genuine issue of material fact as to the existence of a "fairly debatable" question. Plaintiff's attorneys had advised Shelter by letter that they believed Shelter had acted in bad faith. Shelter's suggestion is, to repeat, that plaintiff's failure to ask for attorney's fees incurred in the defense of the declaratory judgment action constitutes an admission that Shelter was not guilty of bad faith. No authority is cited which supports Shelter's point, and we find it to be without merit. What Shelter suggests, quite incorrectly, is that the declaratory judgment should be held to be conclusive not only of all matters actually adjudicated thereby but, in addition, of all matters which could have been presented for adjudication. That rule does not apply to declaratory judgments, which are res judicata only as to those matters actually declared. Restatement (Second) of Judgments § 33, Comment c, p. 336 (1982); 22A Am.Jur.2d *Declaratory Judgments* § 240, p. 881 (1988).

## B

Shelter also argues that it was entitled to summary judgment because its insured, Hazel Scott, and her son, an insured under the provisions of Part II, paragraph 4, of the policy, executed affidavits approving and ratifying Shelter's course of action. The affidavits upon which Shelter relies are replete with allegations made upon information and belief and conclusional averments concerning Shelter's good faith. Plaintiff's response to this argument is that the affidavits should not have been received, and we agree. Rule 74.04(e) requires that supporting and opposing affidavits be made on personal knowledge and set forth "such facts as would be admissible in evidence." In part, the Scott affidavits are hearsay; hearsay may not be relied upon either to avoid or support a summary judgment. *Broadway v. City of Montgomery, Alabama*, 530 F.2d 657, 660–61 (5th Cir.1976); *Daily Press, Inc. v. United Press International*, 412 F.2d 126, 133[3] (6th Cir.1969); *Kersey v. Harbin*, 591 S.W.2d 745, 750[6] (Mo.App.1979). The Scott affidavits also suffer from the same deficiency as the Duncan affidavit. The substance of both Scott affidavits is that they believed their insurer acted in good faith; whether it did so is a matter of law, and the Scott affidavits fall within the rule that affidavits which state ultimate or conclusory facts and conclusions of law cannot be utilized in a summary judgment motion. C. Wright, A. Miller and M. Kane, Federal Practice & Procedure, Civil 2d § 2738, pp. 486–489. The Scott affidavits do not conclusively establish that there is no genuine issue of material fact and that Shelter was entitled to judgment as a matter of law.

## C

Shelter further asserts it was entitled to judgment as a matter of law because the record establishes that its insured, Craig Scott, has been declared a bankrupt, has no legal liability on the judgment and therefore has not been damaged. Very similar arguments have been rejected by the courts, although there is authority to the contrary. In *Maguire v. Allstate Insurance Company*, 341 F.Supp. 866 (D.Del.1972), the action was brought by the administrator of the insured's estate. The administrator sought to recover upon the alternative grounds: 1) that the insurer failed to use reasonable skill and diligence to settle a claim for injuries made by a passenger riding in the deceased insured's car, or 2) the insurer failed to act in good faith to settle the claim. Allstate moved for summary judgment on the ground that the estate was insolvent, therefore it sustained no damage. Allstate's policy contained a provision that bankruptcy or insolvency of the insured or his estate would not relieve Allstate of any obligation. The insurance policy at hand contains the following language as the last sentence of Condition 10:

"... Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the Company of any of its obligations hereunder."

In *Maguire*, the court called attention to the language of Allstate's policy, and held, inter alia, that "obligations" referred to in the conditions of Allstate's policy[3] were not limited to the maximum dollar amount Allstate undertook to pay; rather, the language was to be considered as comprehensive, barring insolvency as a defense against any obligations of the insurer. *Maguire*, 341 F.Supp. at 871. Moreover, the court continued:

"Whether an action for the breach of this obligation [to settle the claim in good faith] sounds in tort, *Stilwell v. Parsons*, 1 Storey 342, 145 A.2d 397 (Del.Sup.Ct. 1958), *Chittick v. State Farm Mutual Auto Insurance*, 170 F.Supp. 276 (D.Del. 1958) (the usual view, 67 Harvard Law Review, 1136, 1138, note 5), or is based upon a breach of an implied covenant of the policy requiring due care and good faith in negotiating a settlement, *Wooten v. Central Mutual Insurance Co.*, 166 So.2d 747, 751 (Ct. of App.La.1964), *Comunale v. Traders & General Insur-*

---

**3.** The language of Allstate's policy was that "... [b]ankruptcy or insolvency of the insured or his estate shall not relieve Allstate of any obligations."

*ance Co.,* 50 Cal.2d 654, 328 P.2d 198, 200–201 (Sup.Ct.Cal.1958), *Hilker v. Western Automobile Ins. Co.,* 204 Wis. 1, 231 N.W. 257, 258 (1930), aff'd on rehearing, 204 Wis. 1, 235 N.W. 413 (1931), *Smith v. Transit Casualty Co.,* 281 F.Supp. 661, 668 (E.D.Tex.1968), *Gray v. Nationwide Mut. Ins. Co.,* 422 Pa. 500, 223 A.2d 8 (1966), makes no difference. Even if the duty cannot be found in the four corners of the policy, it is one which flows from or arises out of the contractual relationship, *Auto Mutual Indemnity Co. v. Shaw,* 134 Fla. 815, 184 So. 852 (1938), *Olympia Fields Country Club v. Bankers' Indemnity Insurance Co.,* 325 Ill.App. 649, 60 N.E.2d 896 (1945). *Wolfberg v. Prudence Mutual Casualty Co.,* [98 Ill. App.2d 190], 240 N.E.2d [176] at 180 [ (1968) ], *supra,* and is included in the 'obligations' referred to in Condition 4 of the policy."

As the plaintiff has pointed out, there are other and additional reasons for holding that Shelter is not entitled to summary judgment because its insured has been declared bankrupt. As Shelter has argued at considerable length, there is authority which supports its position. Nevertheless, we believe the *Maguire* case correctly states the law applicable to this point, and we find Shelter's argument to be without merit. See *Gray v. Grain Dealers Mut. Ins. Co.,* 871 F.2d 1128, 1131–32[3] and n. 3 (D.C.Cir.1989). See also Annot., 63 A.L.R.3rd 627, 641–649 (1975).

### D

 Shelter further maintains it was entitled to summary judgment because its insureds made no demand that plaintiff's claim be settled. We are cited to *Dyer v. General American Life Ins. Co.,* 541 S.W.2d at 704 (Mo.App.1976), wherein our colleagues at St. Louis held that the elements of a cause of action against a liability insurer for a bad faith refusal to settle a claim are: 1) the insurer's assumption of control over negotiation and settlement and legal proceedings brought against the insured; 2) a demand by the insured that the insurer settle the claim; 3) the insurer's refusal to settle the claim within the liability limits of the policy, and 4) proof that the insurer acted in bad faith, rather than negligently. Plaintiff calls our attention to *H & S Motor Freight v. Truck Ins. Exchange,* 540 F.Supp. 766, 769 (W.D.Mo. 1982), wherein the United States District Court for the Western District of Missouri found itself convinced that a demand for payment by the insured was not an essential element of an action for bad faith refusal to settle a claim. We are not called upon to reconcile any apparent conflict. Even if a demand by the insured is an element of the plaintiff's case, the deposition which Craig Scott gave in the United States Bankruptcy Court indicates he was not consulted about, or even informed of, Shelter's negotiations with the plaintiff's attorneys. It therefore could not be said that there is no genuine issue of material fact concerning Scott's demand that plaintiff's offers of settlement be accepted; if the insured were not advised of the offers of settlement, he could not have demanded that the offer be accepted.

### E

 Shelter argues that it is entitled to summary judgment as a matter of law because a claim for bad faith refusal to settle is not assignable. This argument is advanced upon the premise that an unliquidated claim for damages arising out of a tort is not assignable. We think it may once have been the law that an insured's cause of action for bad faith refusal to settle a claim was not assignable, but under the 1978 Bankruptcy Act, specifically 11 U.S.C.A. § 541(a)(1) (West 1979), "all legal or equitable interests of the debtor" become a part of the estate in bankruptcy. The Historical and Revision notes to § 541 indicate that the legislative intent was to include all kinds of property, including causes of action, in the bankrupt's estate. Even before the 1978 Act was passed, the precedents generally indicated that a cause of action for bad faith refusal to settle vested in the insured's trustee in bankruptcy. *Anderson v. St. Paul Mercury Indemnity Co.,* 340 F.2d 406, 409[4] (7th Cir.

1965); *In re Layton,* 221 F.Supp. 667 (D.Ariz.1963) [bankrupt's bad faith action was assignable and was part of bankrupt's estate which vested in his trustee]. The general law, as we understand it, is that a cause for bad faith refusal to settle may be assigned to a judgment creditor either by the insured or his trustee in bankruptcy. See Annot., 12 A.L.R.3d 1158, 1161–1163 § 4 (1967). This point is without merit. Also without merit is Shelter's strained and tenuous argument that plaintiff's recovery was limited by § 375.420, RSMo 1986, the "vexatious delay" statute. Whatever was said concerning the preemption of first party bad faith claims by the Western District in *Duncan v. Andrew County Mutual Insurance Company,* 665 S.W.2d 13, 19 (Mo. App.1983), this action is and has always been a third party bad faith claim. It was so treated on trial, and on general principles Shelter may not change its theory in this court. *Schneider v. Forsythe Group, Inc.,* 782 S.W.2d 139, 146 (Mo.App.1989); *McGlothin v. Eidelman & Traub, Inc.,* 733 S.W.2d 851, 853 (Mo.App.1987). In *Zumwalt,* our Supreme Court specifically held that the vexatious delay statute applies only to actions ex contractu based on the policy, and the "bad faith" action for refusal to settle is an action in tort. *Zumwalt,* 360 Mo. at 373, 228 S.W.2d at 755–56[6].

### V

What we have said disposes of the trial court's entry of a summary judgment for Shelter. As for the plaintiff's contention that the denial of his motion for summary judgment should be reviewed, we have considered the authorities he has cited but we see no reason to depart from our ruling in *Farmers and Merchants Ins. Co. v. Cologna,* 736 S.W.2d 559, 569–70[11] (Mo.App.1987), that an order denying a motion for summary judgment is not an appealable order. Were the point cognizable, we believe it would be unavailing.

To sum up our holding, we will say that we undertake to announce no new or controlling principles. We have tried to avoid expressing any views which could be construed as directions as to how the case should be tried. To reiterate, the question presented on this appeal is whether there is any theory within the scope of the pleadings, depositions and affidavits filed which would permit recovery against Shelter. We believe there is. Accordingly, the judgment is reversed and the cause is remanded.

FLANIGAN, P.J., and PREWITT, J., concur.

SHRUM, J., not participating because not a member of the court when cause was submitted.