**Edward JOHNSON and Virginia Johnson, Respondents, and Wayne Davis, Jr., Respondent,**

v.

**ALLSTATE INSURANCE COMPANY, Appellant.**

**No. WD 68169.**

Missouri Court of Appeals, Western District.

July 29, 2008.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 2, 2008.

Curtis E. Woods, Kansas City, MO, for appellant.

Kirk Rowan Presley, Kansas City, MO and Timothy McDuffey, Camdenton, MO, for respondents.

PAUL M. SPINDEN, Presiding Judge.

This lawsuit results from Allstate Insurance Company's failing to settle a demand for insurance policy limits of $50,000 made against its insured, Wayne Davis, Jr. Edward and Virginia Johnson made the demand after the pickup that Davis was driving crossed the center line of a Camden County highway on March 24, 2000, and crashed head on into the Johnsons' car. The Johnsons suffered life-threatening injuries that required extensive hospital treatment.

After Allstate failed to settle with the Johnsons, the Johnsons sued Davis. Represented by a lawyer hired by Allstate, Davis consented to a judgment for approximately $5 million, including $1.5 million in punitive damages, and negotiated a settlement agreement. As part of the settlement, the Johnsons agreed not to collect any of the judgment from Davis in exchange for his assigning to the Johnsons 90 percent of his claim against Allstate for bad faith refusal to settle.

The Johnsons and Davis jointly sued Allstate for bad faith refusal to settle a claim and for equitable garnishment. After a jury trial, the circuit court entered judgment awarding approximately $5.8 million in compensatory damages and $10.5 million in punitive damages against Allstate.

In appealing this judgment, Allstate claims that the Johnsons and Davis did not make a submissible case. It asserts that they did not establish that it had acted in bad faith in refusing to settle the John-

sons' claim against Davis or that it had acted with malice, a necessary element for punitive damages. We disagree and affirm the circuit court's judgment.

The Johnsons were severely injured in the crash, a major cause of which appeared to be Davis's drunken driving. Officers tested Davis's blood alcohol content at more than twice the legal limit. The Johnsons' compact car was pushed back almost 100 feet after the impact with Davis's pickup. Rescue workers had to cut the Johnsons out of the wreckage before transporting them separately by helicopter to a Springfield hospital.

Edward Johnson was in the hospital for 35 days. He spent 21 of those days in a neuro-intensive care unit (NICU) and was in a coma during part of that time. His injuries included a fractured arm, a crushed pelvis, the tearing of his left hip from its socket, a fractured femur, a crushed sternum, a fractured right collar bone, and a partially severed thumb, which had to be amputated. His hospital bills totaled $185,000.

Virginia Johnson was in the hospital for 40 days and spent part of this time in NICU. She underwent six surgeries. Her injuries included a crushed right ankle and kneecap, a fractured femur, a dislocated ankle, and cut eyelid. Her hospital bills totaled $135,000.

Three days after the crash, Davis informed his insurance agent, Farmer Foster, of the crash, and Foster notified Allstate. Foster told Allstate that Davis had been drinking, drove on the wrong side of the road, hit another car head on, and that the two persons in the other car were seriously injured and had been taken to the hospital by helicopter.

Allstate assigned investigation of Davis's claim to Mary Greene. Davis admitted to Greene that he had drunk beer before the crash. He told her that he did not recall the crash and that he did not know the names of the persons in the other car.

Greene discovered the Johnsons' names, where Virginia Johnson was employed, that the Johnsons' car was a total loss, and that both of the Johnsons were being treated in a hospital NICU. On March 28, Greene called the hospital and spoke to the Johnsons' 16–year–old daughter, who agreed to Greene's going to the hospital the next day to check on the Johnsons.

Before Greene went to the hospital, she received a telephone message from a lawyer, David Sexton, who said that he represented the Johnsons. Sexton advised that Allstate should make no further contact with the Johnson family. Because of Sexton's representing the Johnsons, Greene transferred the file to Bobby Ray Waldrup, a staff claims representative with 20 years' experience. Waldrup's duties included handling of bodily injury claims in which a claimant was represented by an attorney.

On March 30, 2000, Waldrup reviewed the file of Davis's claim, which included the information that Greene had obtained. Waldrup noted that Davis carried minimum limits of coverage, $25,000 per person and $50,000 per occurrence. After reviewing the file, he entered a note in the file: "Needed to know how extensive injuries are; may be policy limit case."

Waldrup assigned the task of completing the liability investigation to Bob Bernard. Bernard concluded that Davis was 100 percent at fault for the accident.

Waldrup received a lien letter from Sexton notifying Allstate that he had a minimum of one-third interest in the proceeds of any settlement. Sexton told Waldrup that his investigation of the facts indicated "that the incident was caused solely by [Davis's] negligence." Sexton also told

Waldrup that the Johnsons were receiving medical treatment and that he would forward medical records and bills as they became available.

Waldrup directed Jackie Glenn to determine the extent of the Johnsons' injuries so Waldrup could respond to Sexton's letter. Waldrup told Glenn to send a letter to Sexton acknowledging Sexton's lien. In the letter, Glenn enclosed a medical and wage authorization form and asked Sexton to have the Johnsons sign and return it to her so she could "secure medical reports and other information needed to properly evaluate this claim." Glenn mailed the letter to Sexton on April 4, 2000.

On April 7, 2000, Waldrup left a message on Sexton's telephone, telling him what Davis's policy limits were and asking Sexton to send the Johnsons' medical records and bills so Allstate could evaluate them. On April 13, 2000, Allstate received a demand letter from Sexton. It was addressed to Waldrup and had been sent by certified mail. In the letter, Sexton offered to settle all of the Johnsons' claims against Davis for the limits of his insurance with Allstate. Sexton told Waldrup that the Johnsons' demand would remain open for 60 days from Allstate's receipt of the letter.

The Johnsons were still in the hospital when Sexton sent the demand letter. Virginia Johnson testified that she and her husband needed money at that time and wanted to settle the case because they had household bills and needed to provide for their daughter. No one at Allstate responded to the Johnsons' demand letter.

The next correspondence between the parties was on June 19, 2000, when Sexton sent a letter in which he demanded that Allstate pay the Johnsons for the loss of their vehicle. Glenn responded by sending Sexton a letter, dated June 26, 2000, in which she said that Allstate needed the Johnsons to sign the medical authorizations so it could evaluate their claim. Sexton did not answer the letter. On November 7, 2000, Glenn sent Sexton another letter that was identical to her letter of June 26, 2000.

On November 16, 2000, Sexton sent a letter to Glenn informing her that the Johnsons still were receiving treatment and that his offer to settle the claim for policy limits had expired. Glenn referred to Sexton's letter in the file of Davis's claim and added, "I never did receive a demand package? ? ? [sic]." Waldrup and Glenn never discussed Sexton's demand letter or Glenn's statement that she never received a demand package or the expiration of the Johnsons' demand.

On December 20, 2000, Sexton sent Glenn a box containing the Johnsons' medical records and bills. In a cover letter, Sexton said that both of the Johnsons still were receiving treatment "so the medical is not complete." Sexton noted that, up to that point, Edward Johnson's medical bills were approximately $120,386, and Virginia Johnson's were approximately $86,567. Sexton told Glenn that medical records and bills were still forthcoming and that he would send them to her as they became available. Sexton also advised that he believed that the Johnsons' medical bills would total $400,000 to $500,000.

On January 15, 2001, Waldrup left a message on Sexton's telephone in which he offered to pay the Johnsons the $50,000 policy limits of Davis's policy. On February 8, 2001, Sexton sent a letter rejecting Waldrup's offer and noting that the Johnsons' demand for Davis's policy limits had expired. Sexton advised Allstate that the Johnsons' new demand was for $3 million and that this demand would remain open for 30 days. Allstate rejected the Johnsons' new demand on April 4, 2001.

On November 20, 2002, the Johnsons sued Davis, and Allstate hired a lawyer to defend Davis. On February 4, 2004, a month and a half before the March 22, 2004, trial, Waldrup sent a letter to Davis informing him of his potential exposure for liability in excess of the policy limits. This was the first time that Allstate told Davis that he could be liable personally for a judgment in excess of policy limits plus prejudgment interest and punitive damages.

The Johnsons' suit against Davis did not go to trial. Instead, on November 29, 2004, the Johnsons and Davis entered into an agreement that they titled, "Assignment and Settlement Agreement Pursuant to Mo.Rev.Stat. Section 537.065 (1986)." In the agreement, Davis admitted that he negligently had allowed his vehicle to cross the highway center line and to collide with the Johnsons' car head on, that his blood alcohol content was .203 percent, and that his conduct of driving while intoxicated showed complete indifference to, or conscious disregard for, the safety of others. Davis consented to judgment for the Johnsons for $2.5 million in actual damages, $1.5 million in punitive damages, and more than $1 million in prejudgment interest, plus costs. In return for the Johnsons' covenant not to execute the judgment against him, Davis assigned to the Johnsons 90 percent of his bad faith refusal to settle claim against Allstate. The circuit court entered a consent judgment for the Johnsons based on the settlement agreement.

On January 5, 2005, the Johnsons and Davis sued Allstate. In the first count of their petition, the Johnsons asserted a claim for equitable garnishment and prayed for judgment against Allstate for more than $1 million in prejudgment interest, post-judgment interest since November 29, 2004, attorney fees, and costs. In the remaining three counts, the Johnsons and Davis asserted claims for bad faith refusal to settle and prayed for damages to satisfy the November 29, 2004, consent judgment, punitive damages, attorney fees, post-judgment interest, and costs.[1]

The circuit court convened a jury trial on November 6, 2006. Two days later, the jury returned a verdict for the Johnsons and Davis on their bad faith refusal to settle claim and assessed more than $5.8 million in compensatory damages and $10.5 million in punitive damages against Allstate. The court entered judgment on the jury's verdict.[2]

In several of its points on appeal, Allstate contends that the Johnsons and Davis failed to make a submissible case of bad faith refusal to settle. In determining whether or not a party made a submissible case, we review the evidence in the light most favorable to the jury's verdict and disregard contrary evidence. *Nemani v. St. Louis University*, 33 S.W.3d 184, 185 (Mo. banc 2000), *cert. denied*, 532 U.S. 981, 121 S.Ct. 1623, 149 L.Ed.2d 485 (2001). Whether or not evidence is substantial and whether or not the inferences drawn from

---

**1.** The Johnsons originally named Davis as a defendant and asserted their claim for equitable garnishment against him and Allstate. In asserting their claims of bad faith refusal to settle, however, the Johnsons asserted one count on their behalf, one count on Davis's behalf, and one count on behalf of themselves and Davis jointly. Before trial, the court realigned the parties to designate Davis as a plaintiff.

**2.** On the equitable garnishment claim, the circuit court determined that, as a matter of law, the Johnsons were entitled to prejudgment interest. Because prejudgment interest was submitted as an element of damages on the bad faith failure to settle claim and was awarded by the jury, the circuit court did not modify the amount of the judgment.

it are reasonable are questions of law. *Simpson v. Indopco, Inc.,* 18 S.W.3d 470, 473 (Mo.App.2000). We will reverse a judgment on the basis that insufficient evidence supported the jury's verdict "only where there is a complete absence of probative fact to support the jury's conclusion." *Giddens v. Kansas City Southern Railway Company,* 29 S.W.3d 813, 818 (Mo. banc 2000), *cert. denied,* 532 U.S. 990, 121 S.Ct. 1644, 149 L.Ed.2d 502 (2001).

Allstate acknowledges that the Johnsons' demand for the $50,000 policy limits of Davis's policy expired on June 14, 2000. It contends, however, that the Johnsons and Davis did not present any evidence to support the jury's finding that it acted in bad faith in reviewing Davis's claim. It emphasizes the difficulty it encountered in obtaining medical records and other information from Sexton and the Johnsons.

■ Under Davis's insurance policy, Allstate had the exclusive right to negotiate and to settle the Johnsons' claims against Davis. An insurer that assumes control of the right to settle claims against its insured may become liable in excess of the policy limits if it fails to exercise good faith in considering an offer to compromise the claim for an amount within the policy limits. *Truck Insurance Exchange v. Prairie Framing, LLC,* 162 S.W.3d 64, 94 (Mo.App.2005). "When an insurer breaches its duty to consider settlement offers in good faith, the insured is free to then reach a reasonable settlement on his own, which he can then enforce against the insurer." *Id.*

In *Zumwalt v. Utilities Insurance Company,* Missouri's supreme court discussed the distinction between an insurer that acts in good faith and one that acts in bad faith. It noted that an insurer has a duty to consider the insured's interest, and if this interest conflicts with its own, good faith obligates the insurer to sacrifice its interest in favor of the insured's. 360 Mo. 362, 228 S.W.2d 750, 756 (Mo.1950). Hence, "bad faith on the part of the insurer would be the intentional disregard of the financial interest of the insured in the hope of escaping the responsibility imposed upon it by its policy." *Id.* at 754 (citing *Johnson v. Hardware Mutual Casualty Company,* 109 Vt. 481, 1 A.2d 817, 821–22 (Vt.1938)). " '[An] insurer must act honestly to effectually indemnify and save the insured harmless as it has contracted to do—to the extent, if necessary, that it must make whatever payment and settlement an honest judgment and discretion dictate, within the limits of the policy[.]' " *Id.* (quoting *Boling v. New Amsterdam Casualty Company,* 173 Okla. 160, 46 P.2d 916, 919 (Okla.1935)).

■ An insurer's bad faith in refusing to settle is a state of mind, which is indicated by the insurer's acts and circumstances and can be proven by circumstantial and direct evidence. *Id.* Circumstances that indicate an insurer's bad faith in refusing to settle include the insurer's not fully investigating and evaluating a third-party claimant's injuries, not recognizing the severity of a third-party claimant's injuries and the probability that a verdict would exceed policy limits, and refusing to consider a settlement offer. *See Landie v. Century Indemnity Company,* 390 S.W.2d 558, 566 (Mo.App.1965); *Maryland Casualty Company v. Elmira Coal Company,* 69 F.2d 616, 620 (8th Cir.1934). Other circumstances indicating an insurer's bad faith include not advising an insured of the potential of an excess judgment or of the existence of settlement offers. D.N. ALLMAYER, M.D. GIBBONS, J.L. MULLEN, BAD FAITH LITIGATION IN MISSOURI 13 (National Business Institute 2002).

■ The Johnsons and Davis contended that Allstate's intentional disregard of

Davis's financial interest was evident in the way that Allstate handled the Johnsons' demand letter. They presented the testimony of Ronald Clifton, a territorial supervisor for Fireman's Fund with more than 26 years' experience in the insurance industry, and Walter Simpson, a Kansas City lawyer who had 39 years' experience in representing plaintiffs, defendants, and insurance companies in personal injury cases. Clifton and Simpson opined that Allstate did not handle the Johnsons' claim in accord with insurance industry standards or its own "Third Party Good Faith Claim Handling Best Practices" manual.[3]

Clifton testified that, when Waldrup assumed oversight of the case for Allstate on March 30, 2000, Allstate had enough information then to understand that the Johnsons' claim surely would exceed Davis's policy limits. He noted that Allstate knew that the Johnsons had been flown separately by helicopter to the hospital and that both were receiving intensive care. Moreover, he testified that Davis's intoxication should have raised a "red flag" to Allstate concerning how large Davis's liability exposure could be.

Simpson testified that Allstate had enough information within 30 days after the accident to know that the Johnsons' claim was "way above" Davis's policy limits. Specifically, Simpson noted that Allstate knew that the Johnsons were flown by helicopter to the hospital and that such flights typically cost "several thousand dollars." He added that the Johnsons received intensive care for several days after the accident and that such care typically costs "several thousand dollars" daily. Moreover, he said, Allstate should have known that, in a case such as this, the Johnsons would be entitled to recover not only their medical bills but also their future medical expenses, damages for pain and suffering and mental anxiety, and, because Davis's blood alcohol content was twice the legal limit, Davis faced possible punitive damages. Simpson rejected Allstate's assertion that it was unsure that the crash caused the Johnsons' injuries. Simpson testified that one could assume that the Johnsons' injuries were related to the accident because they had to be cut out of the wreckage, were flown by helicopter to the hospital, and received intensive care. Simpson believed that Waldrup assumed that the crash caused the Johnsons' injuries when he noted, on March 30, 2000, that it "may be a policy limit case."

Allstate contends that it needed further information to verify the cause and extent of the Johnsons' injuries, but it did little to obtain this information. After Greene transferred the file to Waldrup, the extent of Allstate's investigation was to ask the Johnsons' attorney to send medical bills, records, or signed authorizations to release medical information. When Sexton did not respond, Allstate did nothing to investigate the claim. Even after Allstate received the Johnsons' policy limits demand letter on April 13, 2000, Allstate did not investigate the claim.

According to Clifton, the industry's standard time frame within which to investigate a claim is 30 days. An insurance company is not required to have medical records and bills to investigate and to settle a claim, he testified. When an insurance company cannot get medical records and bills to investigate a claim, he said, it still can obtain a copy of the police report to get a good indication of how the mishap

---

**3.** The manual said, on page 2, that its purposes were to "[e]nsure timely response to demand letters;" "[i]mprove recognition of serious injuries with potential limits exposure;" "ensure timely handling of summons and complaints;" "[e]nhance communication with insureds;" and "[i]mprove[ ] file documentation."

occurred, the severity of the injuries, and the identity of witnesses, emergency workers, and law enforcement officers who investigated the incident. Moreover, he added, Allstate could have called the hospital to determine whether or not the claimants were still being treated there, and it could have visited the claimants' attorney to try to get information. Allstate did none of these things.

Clifton testified that an insurance company is not allowed "to just sit back" and wait for the claimants' attorney to send medical bills to determine the extent of the claimants' injuries, as Allstate did in this case. Had Allstate investigated the case thoroughly and properly, Clifton opined, Allstate would have had sufficient information to justify its paying the Johnsons' claim within 30 to 60 days after the crash, if not sooner.

Clifton noted that Allstate did not follow its own manual for handling claims. Contrary to Waldrup's practice, he noted, the manual did not require its claims adjusters to obtain medical records and bills before settling. The manual authorized a procedure for handling claims involving serious injuries like the Johnsons suffered. The manual provided that, within two days of learning that a claim involved a serious injury, Allstate's adjuster was to have a "serious injury alert conference." During this conference, the supervisor and adjuster were to review the file to determine whether or not they had sufficient information to evaluate the claim and to determine whether or not Allstate should make an offer of policy limits. Despite his awareness that the Johnsons' claim involved "serious injuries," as that term is defined

in the manual, Waldrup never had such a conference.

The Johnsons' demand letter satisfied the requisites of Section 408.040, RSMo 2000, which authorizes individuals with a claim like the Johnsons' to make a demand to an insurance company for either the policy limits or for a specific amount of money. As required by the statute, they sent their demand by registered mail and kept the demand open for 60 days. The statute did not require the Johnsons to send any documentation to support their demand.[4]

According to Simpson, when an insurance company receives a time-limit demand like the one that Allstate received from the Johnsons, it "sets off a couple of bells and whistles." Such a letter, he said, should alert an insurance company that it could be liable for prejudgment interest if it does not respond to the demand. Also, in a case such as this one with minimal coverage, an insurance company must be concerned about facing a bad faith claim if it rejects a policy limits demand, he added.

Allstate's manual set out procedures for handling demand letters, including holding an alert conference with a supervisor to determine the proper response to the demand. The manual required Allstate to respond to the demand in writing and to submit a copy of its response to the insured. Allstate admitted that Waldrup received the Johnsons' demand letter in the ordinary course of business on April 13, 2000, but Allstate did not follow any of its procedures in handling the letter. Indeed, the record indicates that Allstate did nothing with the demand letter.[5]

**4.** The General Assembly amended Section 408.040 in 2005 to require documentation to support a demand letter.

**5.** Allstate argues that, even though it admitted that Waldrup received the Johnsons' demand

letter, the Johnsons and Davis did not present substantial evidence showing that Waldrup saw it. Waldrup asserted that the demand letter essentially got lost in the mail room in Allstate's St. Louis office and never made it to

Simpson testified that, to act in accord with reasonable industry practice, Allstate should have told Davis about the demand. He testified that Allstate also should have reminded Davis what his policy limits were and advised him of the possibility of a judgment in excess of his insurance coverage. Indeed, Clifton testified that, under insurance industry standards, Allstate should have notified Davis shortly after the crash that (1) he might be exposed to paying any excess judgment above the policy limits because he was intoxicated and because his policy limits were low and (2) he might need counsel to represent him because of this potential liability.

Waldrup admitted that, although he knew that he was obligated to keep Davis informed of the claim, he never advised Davis of the Johnsons' demand for $50,000 that would have extinguished all of Davis's liability. He further acknowledged that he never advised Davis that, if Allstate did not settle the case within the limits of Davis's policy, Davis would have excess exposure and potentially punitive damage exposure and that he never advised Davis that he had a right to engage his own counsel. The first time that Allstate told Davis about his potential for excess exposure was in a letter dated February 4, 2004, almost four years after the crash and less than two months before trial of the Johnsons' claims against Davis.

By not communicating with Davis, Allstate deprived him of an opportunity to eliminate his risk effectively. Simpson

opined that, had Allstate notified Davis before the demand letter's expiration about his potential for excess exposure and advised him of his limited opportunity to settle the case for $50,000, Davis could have hired a lawyer for the purpose of persuading Allstate to settle. Simpson testified that an insured's counsel typically accomplishes this through use of a "hammer letter," which makes a "big difference" in claim handling. He opined that, had Allstate notified Davis of his right to retain counsel and had Davis's attorney sent a hammer letter, the letter would have been effective in getting Allstate to pay the claim limits and Davis's risk of liability in excess of the limits of his policy would have eviscerated.

Allstate's failure to recognize the severity of the Johnsons' injuries and the probability that the claim would far exceed Davis's policy limits; its failure to investigate the claim and respond to the demand in accordance with insurance industry standards and its own good faith claim handling manual; and its failure to advise Davis of the demand, his likely exposure for an excess judgment, and his right to retain counsel, are all circumstances supporting a reasonable inference that Allstate's refusal to settle was in bad faith. This evidence was sufficient to support the submitting of the Johnsons' and Davis's bad faith refusal to settle claim to the jury.

In arguing against submissibility, Allstate contends that the evidence at trial could support an inference that it acted in

his desk. The jury had a sound basis for believing otherwise. Waldrup did not investigate how the demand letter could have gotten lost or why Allstate's manual for handling the receipt of demand letters was not followed when it received the Johnsons' demand letter. After the Johnsons rejected Allstate's January 15, 2001, offer to settle for the policy limits, Waldrup contacted an attorney for Allstate to tell him the case would not be resolved for the

policy limits. Waldrup told the attorney about the Johnsons' policy limits demand letter and never indicated that he had not seen it. Indeed, Waldrup described the Johnsons' demand letter to Allstate's attorney as a "somewhat generic lien demand letter" that did not cite the Missouri statute but "made a request for policy limits and [was] left open for 60 days."

good faith. It blames the Johnsons' failure to "keep their promise" to provide medical records and bills in a timely fashion for its not being able to meet the demand letter's deadline. It contends that it should have been able to verify the Johnsons' claim by examining their medical records and bills. Without these documents, it asserts, it could not investigate, evaluate, and respond properly to the Johnsons' demand.

■ That the jury did not agree with the inferences for which Allstate contends is the deciding factor. When trial evidence poses two reasonable but different inferences, this court is obligated to defer to the jury's verdict. *Washington v. Barnes Hospital*, 897 S.W.2d 611, 615 (Mo. banc 1995). Allstate's first and second points lack merit.

■ In its third point, Allstate claims that the circuit court erred in denying its motion for judgment notwithstanding the verdict on the Johnsons' and Davis's claim for punitive damages. The Johnsons' and Davis's burden in making a submissible case for punitive damages was to show by clear and convincing evidence that Allstate had a culpable mental state, "either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." *Werremeyer v. K.C. Auto Salvage Company, Inc.*, 134 S.W.3d 633, 635 (Mo. banc 2004). "Factual inferences which convincingly and clearly support the notion that the defendant acted with evil motive or reckless indifference to the rights of others are sufficient to meet the standard for submission of punitive damages." *Perkins v. Dean Machinery Company*, 132 S.W.3d 295, 300 (Mo.App.2004).

■ As noted *supra*, the Johnsons and Davis presented evidence that Allstate had sufficient information within a week after the crash that the Johnsons' claim against Davis would exceed policy limits. Nevertheless, when Allstate received the Johnsons' demand for policy limits, it chose to do nothing—not even to respond to the letter. Allstate's completely ignoring the demand letter left Davis exposed to a potential judgment far in excess of his policy limits. To compound the problem, Allstate failed to fulfill its duty to inform Davis of the demand letter, his exposure for damages in excess of the policy limits, including punitive damages and prejudgment interest, or his right to retain counsel. Allstate did not inform Davis about his potential for excess exposure until almost four years after the accident.

Allstate's actions demonstrate a reckless disregard for Davis's interests as its insured. The evidence was sufficient to submit the punitive damages claim. Allstate's third point lacks merit.

In its fourth, fifth, and sixth points, Allstate argues that the Johnsons' and Davis's claims for bad faith refusal to settle were barred because the settlement agreement, in which Davis assigned 90 percent of his bad faith refusal to settle claim to the Johnsons, was void. Allstate claims that the agreement violates public policy because it allows Davis to profit from his wrongdoing, and the agreement is the product of fraud and collusion because Davis's retaining 10 percent of his claim improperly induced him to agree to an inflated punitive damages award.

■ Allstate's claims regarding the validity of the agreement constitute affirmative defenses. An affirmative defense is "a procedural tool available to defendants which 'seeks to defeat or avoid the plaintiff's cause of action[ ] and avers that[,] even if the allegations of the petition are taken as true, the plaintiff cannot prevail because there are additional facts that permit the defendant to avoid the legal re-

sponsibility alleged.'" *Thompson v. Brown and Williamson Tobacco Corporation*, 207 S.W.3d 76, 122 (Mo.App.2006) (quoting *Mobley v. Baker*, 72 S.W.3d 251, 257 (Mo.App.2002)).

 Rule 55.08 requires a party to plead affirmative defenses in its responsive pleading by setting forth "a short and plain statement of the facts showing that the pleader is entitled to the defense." In its answer, Allstate made general allegations that "the purported assignment of the claim is void," and "the claims are barred by waiver and estoppel."[6] Allstate did not plead any facts to support these allegations. Allstate's answer did not raise any of the affirmative defenses it now asserts. The first time that Allstate argued that the agreement violated public policy was in its oral motion for a directed verdict at the close of the plaintiffs' case. The first time that Allstate argued that the agreement was the product of fraud and collusion was in its motion for judgment notwithstanding the verdict or for a new trial. This was too late. Affirmative defenses that are not properly pleaded are deemed waived. *Smith v. Thomas*, 210 S.W.3d 241, 243 (Mo.App.2006). We deny Allstate's fourth, fifth, and sixth points.

In its seventh point, Allstate claims that the circuit court erred in denying its motion for new trial because the court abused its discretion in excluding evidence of the settlement agreement. The Johnsons and Davis filed a motion *in limine* to exclude evidence of the settlement agreement. Allstate opposed the motion, stating that, pursuant to the agreement, Davis agreed to a judgment against him for punitive damages on the condition that, if the Johnsons prevailed, he would receive 10 percent of the damages. Allstate did not state why this fact made the agreement admissible. Allstate also contended that evidence of the agreement was admissible to show Allstate's good faith because Allstate agreed that the compensatory damages in the agreement were fair and reasonable so that Davis would be insulated from further liability. The court granted the motion, finding that *Hackman v. Dandamudi*, 733 S.W.2d 452, 458 (Mo.App. 1986), prohibited evidence of the settlement agreement.

Allstate attempted to introduce evidence of the agreement again during Edward Johnson's testimony. After Johnson testified that a judgment was entered on his and his wife's claims against Davis, Allstate asked that it be permitted to elicit testimony that the judgment was entered pursuant to the settlement agreement. Allstate argued that it should be allowed to introduce this evidence because Davis had agreed to $1.5 million in punitive damages, 10 percent of which he stood to get back. Again, Allstate did not state why this fact made the agreement admissible.[7]

At the close of the evidence, the Johnsons and Davis offered the settlement agreement into evidence only for the circuit court's consideration of the equitable garnishment issue. Allstate objected to the circuit court's admitting the agreement solely for this purpose. It argued that it had "an issue" with Davis's consenting to $1.5 million in punitive damages "as long as he gets part of it back himself for his own punitive act." Again, Allstate did not

---

6. Although the concurring opinion questions the assignability of a bad faith failure to settle claim, we do not address the issue because Allstate does not raise it in this appeal.

7. Moreover, had Davis not assigned part of his claim to the Johnsons and moved ahead alone against Allstate, he conceivably stood to recoup from Allstate all of the judgment, including all of the $1.5 million in punitive damages.

specify what its "issue" was or why this fact made the agreement admissible for the jury's consideration. The circuit court received the agreement into evidence but did not permit Allstate to publish it to the jury. In its motion for new trial, Allstate contended that the circuit court erred in refusing to allow it to "accurately inform and advise the jury of the true facts of the settlement agreement and assignment between [the Johnsons] and [Davis]."

On appeal, Allstate argues that it should have been allowed to introduce evidence of the settlement agreement to show that Davis was not harmed as much as he claimed to be—that he would be able to retain 10 percent of the bad faith claim, including 10 percent of the Johnsons' judgment against him that the jury had to believe constituted damages to him. This is not the same ground upon which Allstate sought admission of the agreement at trial.

■■■■ "When an appellant challenges the exclusion of evidence, the 'appellant is limited to the reason he gave at the time he made the offer of evidence.'" *Marion v. Marcus,* 199 S.W.3d 887, 892 (Mo.App. 2006) (quoting *Atherton v. Kansas City Power & Light Company,* 356 Mo. 505, 202 S.W.2d 59, 64 (Mo.1947)). " 'It is the obligation of a party to bring to the attention of the trial court its position as to relevancy of evidence offered.... It cannot advance a theory of admissibility on appeal different from that advanced at trial.'" *Id.* (quoting *Frein v. Madesco Investment Corporation,* 735 S.W.2d 760, 762 (Mo.App. 1987)). Rule 84.13(a) says, "[A]llegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury tried case."

■■■ By not advising the circuit court that evidence of the agreement's provision permitting Davis to retain 10 percent of

the bad faith claim was relevant to show the jury that Davis was not harmed as much as he claimed to be, Allstate failed to preserve this ground of admissibility for our review. Allstate's seventh point is denied.

■■■■ Allstate next claims that the circuit court erred in denying its motion for a new trial or in not ordering remittitur because the $10.5 million punitive damages award was excessive. A "[c]omplaint of an excessive jury verdict, standing alone, does not entitle a defendant to relief in the form of a new trial." *Armon v. Griggs,* 60 S.W.3d 37, 40 (Mo.App.2001). To obtain a new trial on the basis of an excessive verdict, the defendant must demonstrate that the verdict was the product of bias and prejudice. *Id.* To do this, the defendant must show that the verdict was " 'glaringly unwarranted' by the evidence and that some trial error or misconduct by the prevailing party was responsible for prejudicing the jury against the defendant." *Id.* (citation omitted).

■■■ Although Allstate alleged in its motion for new trial that the punitive damages award was the product of jury bias and prejudice, Allstate does not assert this on appeal. Allstate claims only that the verdict was excessive. Because jury bias and prejudice, if shown, are the only bases on which a new trial would have been warranted, we affirm the circuit court's denial of Allstate's motion for new trial.

■■■ Alternatively, Allstate argues that the circuit court erred in not remitting the punitive damages award. The circuit court may order remittitur when "the jury errs by awarding a verdict that is simply too bountiful under the evidence." *Id.* In those circumstances, "[a] new trial is not required because the jury made an honest mistake as to the nature and extent of

damages." *Id.* Allstate argues that the punitive damages award was excessive because the compensatory damages award was high and its culpability was low.

 The problem with Allstate's claim is that it did not seek remittitur in the circuit court. It sought only a new trial.[8] While the circuit court could have remitted the damages *sua sponte—see, e.g., Children International v. Ammon Painting Company*, 215 S.W.3d 194, 198 (Mo.App.2006)—that it did not is not a basis for error. The circuit court cannot be deemed to have erred in denying a claim for remittitur that was never presented to it. *See Brizendine v. Conrad*, 71 S.W.3d 587, 593 (Mo. banc 2002). Allstate's point is denied.

JOSEPH M. ELLIS, Judge, concurs.

JAMES M. SMART, JR., Judge, concurs in a separate opinion.

JAMES M. SMART, JR., Judge, concurring.

If Wayne Davis, after becoming a $5.8 million judgment debtor, had pursued his claim for bad faith failure to settle ("BFFS") pursuant to an agreement with the Johnsons, and had obtained the same compensatory and punitive damage awards against Allstate (and had then paid 90 per cent of the recovery to the Johnsons in accordance with the agreement), the case would seem to me to be relatively straightforward. But I do not see it as straightforward because, although the issue was not raised, I remain unconvinced that the Johnsons were entitled to participate as assignees and thus as co-plaintiffs.

I concur entirely with the court's opinion. I write separately because, although ordinarily I am very reluctant to comment on an issue not litigated by the parties, I feel a responsibility to future BFFS litigants to suggest that the procedural scenario here may be less than reliable as a pattern for future litigation. In particular, though the parties raise no issue in this regard, I wish to express uncertainty as to the purported assignability of a part of Davis' unliquidated personal tort claim.

The issue arises out of the fact that because of Allstate's failures to keep Davis informed and to protect his interests, Davis, with the help of the defense counsel provided by Allstate, ultimately chose to enter into an agreement (not a section 537.065 agreement, though it purports to be under 537.065)[1] whereby Davis purported to assign 90% of his claim against Allstate to the Johnsons in return for their

---

8. In its reply brief, Allstate contends that remittitur is a form of judgment notwithstanding the verdict, so, by asking the court for a judgment notwithstanding the verdict on the basis that the punitive damages award was excessive, it was essentially asking the court for remittitur. A judgment notwithstanding the verdict "is properly granted when the motion identifies at least one element of the plaintiff's case that is not supported by the evidence." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). Section 537.068, RSMo 2000, authorizes the circuit court to enter a remittitur order "if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compen-

sation for plaintiff's injuries and damages." Thus, a motion for judgment notwithstanding the verdict challenges the submissibility of the plaintiff's claim, while a motion for remittitur challenges the proportionality of the damages awarded on the plaintiff's claim. The two motions are not the same.

1. There would seem to be no reason to believe that an agreement that does not fit the terms of 537.065 is therefore necessarily illegal or unenforceable. The parties may have designated it as an agreement under 537.065 so that it could be accepted for filing in the public records for the benefit of Davis' credit rating.

agreement to hold him harmless from their collection efforts.[2]

This is where the case becomes something other than straightforward. The Johnsons and Davis sued together as joint plaintiffs. The garnishment claim (Count I) was brought by both Davis and the Johnsons (though it is not clear how Davis had a garnishment claim, and not clear how the garnishment would include the bad faith allegations).[3] Next, in Count II, *the Johnsons* sued Allstate for BFFS, pleading that they *had been assigned* ninety percent of Davis' claim, and that, as a result of Allstate's bad faith, they (*that is, the Johnsons*) had suffered "injuries, including emotional distress, anguish, and attorney's fees." This is mysterious, of course. Allstate had no legal duty to the Johnsons to negotiate with them. Any emotional distress caused to the Johnsons by Allstate's refusal to settle is not compensable.[4] Count III purported to be a claim for BFFS, again alleging that *both* Davis and the Johnsons "suffered injuries, including emotional distress, anguish, and attorney's fees." Count IV was a claim for BFFS brought by Davis, again alleging injuries, including "emotional distress, anguish, and attorney's fees."

Only two verdict directors were submitted—one for compensatory damages for BFFS, and one for punitive damages. The verdict directors regarded *the Johnsons and Davis* as the plaintiffs, but the court properly specified in the compensatory verdict director that the jury needed to find that *Davis* was damaged by Allstate's bad faith. The two elements submitted in that verdict director were 1) bad faith in failing to settle, and 2) damage to Davis. The trial court informed the jurors that if they found that Allstate beached its duty to Davis, they were to award to the plaintiffs compensatory damages in the amount of $5.8 million (which was tied to the underlying judgment against Davis).

Davis did not attend the trial in person or appear by deposition. There was no testimony as to any damages caused him by Allstate's bad faith. Davis was represented at trial by attorneys engaged by the Johnsons pursuant to Davis' agreement with the Johnsons. The Johnsons appeared in person and by attorney and testified.

There was discussion at trial of Allstate's poor practices in dealing with the Johnsons, and substantial evidence as to how badly the Johnsons were damaged in the collision (perhaps beyond what was necessary to show Allstate's fault in failing to protect Davis' interests). Because the Johnsons and Davis were aligned together, the case may have taken on a tone whereby the jury, despite efforts of the court to keep the case focused, could have viewed the punitive damage award as designed to punish Allstate for its actions toward the

---

2. The agreement was somewhat ambiguous as to whether it was a promise to pay 90% of the net proceeds of a judgment or whether it was an assignment of "90% of [Davis'] bad faith claim" to the Johnsons. The parties obviously understood it to be an actual assignment of 90% of Davis' personal injury tort claim.

3. The pleadings and the jury instructions show that the parties merged an equitable garnishment action with Davis' tort claim for bad faith failure to settle (BFFS). Perhaps the trend in the law is to allow an equitable

garnishment action to include a personal tort claim for BFFS, but I am not sure exactly how the law of garnishment can accommodate such a merger.

4. The only compensation for the tort victim in an insurer's unreasonable delay is found in the statutorily created pre-judgment interest provision—to give some financial incentive to a tortfeasor's insurer to investigate and settle cases.

Johnsons[5] as well as for its actions and omissions in leaving Davis unprotected.[6]

Allstate complains that for "public policy" reasons Davis should not be allowed to receive some of the punitive damage judgment when he himself was a tortfeasor and wrongdoer. Allstate also claims that, at the very least, the jury should have been told that Davis would get 10% of anything awarded. The court's opinion is correct to the effect that these specific arguments were not preserved and are made for the first time on appeal. I wish to add, however, that I suspect that these arguments fail to come to grips with the real issue lurking beneath the surface.

Davis had a claim for BFFS. This was a tort claim that was personal to Davis, and the claim included emotional distress, anguish, and attorney's fees (all of which he pleaded but did not prove). "Personal torts" involve "injuries to the person, whether to the body, reputation, or feelings." *Travelers Indemnity Co. v. Chumbley,* 394 S.W.2d 418, 422 (Mo.App.1965). In its broad sense, the term "personal injury" is coextensive with the class of torts known as "personal torts." *Gremminger v. Missouri Labor & Indus. Rel. Comm'n,* 129 S.W.3d 399, 402 (Mo.App. 2004). Davis could have kept his personal injury tort claim. I cannot see how it would be contrary to public policy to allow an insured (though that insured may have wantonly caused serious injuries) to submit a claim for compensation arising from the violation of his insurer's duty of good faith to him.

Also, I fail to see that it would be contrary to public policy to allow a party such as Davis to seek *punitive* damages for BFFS. Allstate cites no pertinent authority for its argument to the contrary. Punitive damages in such a case would be designed to punish the insurer and to deter that company and others from similar bad faith failures to settle. It would also seem logical for the compensatory and punitive awards to exceed $3 million because that is what Allstate could have paid earlier to redeem its breach of good faith toward Davis.

Allstate implies that a claim for punitive damages for BFFS should be brought only by the underlying tort victim and not by the wrongdoing tortfeasor. I actually would have thought an argument could be made the other way around: that the claim for punitive damages should be prosecuted only by the person who *actually was injured* (at least allegedly) by the insurer's bad faith (that is, the insured tortfeasor), not by the parties who were actually enriched by the insurer's bad faith.

Who owned the claim for punitive damages for BFFS in this case—was it the Johnsons, innocent people with horrible injuries, to whom Allstate owed no duty of good faith—or Davis, not innocent as far as the accident, but the one to whom the duty was owed, who suffered the violation

---

**5.** It is interesting to ponder the question of whether Allstate's bad faith actually damaged the Johnsons in view of the agreement the Johnsons were enabled to enter into because of Allstate's bad faith. Without Allstate's bad faith, the Johnsons would have received only $50,000. Thus, to the extent that the punitive damages were punishing Allstate for its actions toward the *Johnsons,* there is an interesting irony in the fact that the Johnsons should be highly grateful that Allstate exercised bad faith toward Davis.

**6.** There is also an irony here in regard to Davis' damages. Though he pleaded the personal injury of emotional distress, anguish, and attorney's fees, he did not show up at trial to present evidence of any such damage. It is true that the entering of the judgment against him pursuant to the agreement would imply damage to his credit (though mitigated by the Johnson agreement), but there was no evidence of any other damage.

of duty? The jurors in this case would have perceived that the claim for punitive damages was owned by both Davis and the Johnsons, as co-plaintiffs, who were launching a united attack against a party whose subsequent malevolent conduct apparently warranted a joint effort.

To begin to understand the questions one might have about the assignability of BFFS claims, we should start by understanding the nature of BFFS claims. BFFS is an action in tort, while bad faith failure to defend (BFFD) is an action in contract. *See Bonner v. Auto. Club Inter–Ins. Exchange,* 899 S.W.2d 925, 928 (Mo.App.1995). Traditionally, it would seem that a BFFS claim would *not* be assignable because it is a personal tort claim like legal malpractice or breach of fiduciary duty. *See Travelers Indem. Co. v. Chumbley,* 394 S.W.2d at 423 (cause of action for personal injury is not assignable); *See also Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554, 564 ("It may once have been the law that an insured's cause of action for bad faith refusal to settle a claim was not assignable.").

We are not here talking about a breach of a contract duty, such as failure to defend. Nor are we talking about a property tort, which involves injury or damage to property. *See Chumbley,* 394 S.W.2d at 422. We are talking about a breach of a duty implied in law arising out of the fact that Allstate had the exclusive right to control the defense and settlement of the Johnsons' claims, leaving Davis vulnerable to a grave threat of excess liability. *See Zumwalt v. Utilities Ins. Co.,* 360 Mo. 362, 228 S.W.2d 750, 754 (Mo.1950).

There is a difference, of course, between an unliquidated personal tort *claim* and a *judgment* obtained for such a claim. A *judgment* for a BFFS claim, of course, would be fully assignable as would any other liquidated chose in action—as prop-

erty. *See Marshall v. N. Assurance Co. of Am.,* 854 S.W.2d 608, 610 (Mo.App.1993), (public policy reasons prohibiting assignment of a personal injury claim do not apply where the claim has been reduced to a judgment).

There is presumably a trend to treat BFFS tort *claims* as assignable, and Allstate perhaps has accepted that trend. As far as I understand Missouri law, however, I am not so sure the matter is settled, and this case might tend to illustrate some considerations in that regard.

A key case to consider as to such assignability is *Ganaway v. Shelter Mut. Ins. Co.,* 795 S.W.2d 554 (Mo.App.1990). In *Ganaway,* the plaintiff was a passenger in Scott's (the insured's) automobile when an accident occurred, injuring the plaintiff. *Id.* at 555. The plaintiff filed suit against Scott. *Id.* at 559. The insurer, Shelter Mutual, chose to raise non-meritorious issues by interpleader, and failed to settle Scott's claim within policy limits. The plaintiff obtained a judgment against Scott. *Id.* After obtaining this judgment, an involuntary Chapter 7 petition was filed in bankruptcy court against Scott. *Id.* Scott's trustee assigned his unliquidated bad faith claim against the insurer to the tort plaintiff. *Id.*

The insurer argued that a BFFS claim was not assignable because an unliquidated claim for damages arising out of a tort is not assignable. *Id.* at 564. The court concluded that even if under the common law, a BFFS claim was not assignable, under the terms of the bankruptcy act the claim was assignable. *Id.* at 564–65.

*Ganaway* was discussed in *Quick v. Nat'l Auto Credit,* 65 F.3d 741, 746–47 (8th Cir.1995) (applying Missouri law) (holding that in that case—where the defendant did not have an exclusive right to control settlement—there was no bad faith claim).

The court, in *obiter dictum*, commented on the fact that under Missouri law, BFFS claims were not assignable. *Id.* at 746. The court in *Quick* thought that *Ganaway* involved an exception to nonassignability because *Ganaway* seemed to rest the assignability on the statutory authority of the bankruptcy code. *Id.* at 747.

Then came *Freeman v. Basso*, 128 S.W.3d 138 (Mo.App.2004). This case did not involve a BFFS claim, but instead involved a bankruptcy assignment of claims for legal malpractice and breach of fiduciary duty. *Id.* at 142. The court held that the claims of legal malpractice claim and breach of fiduciary duty were unliquidated personal tort claims that were *not* assignable. *Id.* In so holding, the court attempted to distinguish *Ganaway* by stating, interestingly, that *Ganaway* was not contrary to the ruling in *Freeman v. Basso* because bad faith claims against insurance companies were assignable even prior to *Ganaway*. *Id.* at 143. The court cited *Magers v. Nat'l Life & Accident Ins. Co.*, 329 S.W.2d 752, 756 (Mo. banc 1959) and *Citicorp Indus. Credit Inc. v. Federal Ins. Co.*, 672 F.Supp. 1105, 1106–08 (N.D.Ill. 1987) (interpreting Missouri law) in support of this proposition.

The court's reliance on *Magers* and *Citicorp* was misguided because neither case involved assignment of a BFFS claim, nor even of a personal tort claim of any kind. *Magers* involved an action to recover cash surrender values of certain policies of industrial life insurance which had lapsed for default in payment of premiums. 329 S.W.2d at 753. And *Citicorp* was an action brought under a policy of crime insurance to seek indemnity for losses due to forgery. 672 F.Supp. at 1105. In both cases there was no reason to restrict the assignability of the contractual claims, which involved only property losses.

*Freeman v. Basso* recognized the general rule that legal malpractice and breach of fiduciary duty claims, as personal torts, are not assignable in Missouri for policy reasons. *See, e.g., Chumbley*, 394 S.W.2d at 423. *Ganaway* had seemed to suggest that perhaps the bankruptcy act made such a claim assignable. 795 S.W.2d at 564. The court in *Freeman* did not regard the bankruptcy act as creating assignability. The courts in *Freeman* and *Ganaway* may also have had different views about how clear it was that "prior to *Ganaway*, bad faith claims against insurance companies were assignable." *Freeman*, 128 S.W.3d at 143; *compare with Ganaway*, 795 S.W.2d at 564 ("[I]it may once have been the law that an insured's cause of action for bad faith refusal to settle a claim was not assignable"). Of note is the fact that the court in *Freeman v. Basso* used the term "bad faith claims" without drawing any distinction between BFFS (a personal tort claim) and BFFD (a contract claim).

The court in *Freeman* believed that "bad faith claims" have been assignable for some time, and the court presumably saw no reason that "bad faith claims" *should not be* assignable. As to claims of legal malpractice and breach of fiduciary duty, however, the court believed that assignability *would* present public policy concerns. *See Freeman*, 128 S.W.3d at 142. The court did not seem to see any similarity between the unliquidated personal tort claims *in Freeman* and an unliquidated BFFS claim. Did the court fail to recognize that there are similarities, including the fact that in both kinds of cases, if I understand correctly, a claimant may seek to recover damages for such things as emotional distress, damage to reputation, and expenses related thereto?

In *Truck Insurance Exchange v. Prairie Framing, LLC*, 162 S.W.3d 64 (Mo.App.

2005), the insured, a framing company, brought claims of bad faith failure to defend ("BFFD") as well as claims of BFFS. No issue was raised as to the assignability of either the BFFS claim or the BFFD claim under an agreement with the tort plaintiffs, who perhaps could pursue the BFFD claim by way of a garnishment action anyway. Thus, there was no adjudication of the issue of assignability of the BFFS claim in that case. However, when no concern is expressed by the court as to such a matter, there is a tendency for attorneys involved in subsequent litigation to see the case as providing an established guidepost.

Despite the existence of the foregoing cases, because neither the Court of Appeals nor the Missouri Supreme Court have addressed the matter of public policy differences between assignment of BFFS claims and assignment of other personal tort claims (such as legal malpractice), the answer to the issue of the assignability of BFFS claims seems to me to be less than certain.[7]

Perhaps there is a tendency to assume that Section 537.065 authorizes the assignment of claims for BFFS. I cannot find such authorization anywhere in the statute. Section 537.065 does not purport to change the common law as to assignability of claims. In fact, the language of section 537.065 suggests that it is not about the assignability of claims at all. The statute provides that, when there is an unliquidated claim for damages against a defendant, that defendant, in return for his payment of a "specified amount," may obtain an agreement limiting execution of the later judgment. It also allows the recording of such an agreement in the public records. I do not see that it purports to change the common law so as to allow the assignment of unliquidated personal tort claims.

I assume that the holder of a BFFS claim may agree *in advance* of a BFFS *judgment* to pay the ultimately-derived net proceeds of the BFFS *judgment* to the holder of the underlying tort claim, with payment to be made *after* the BFFS claim is prosecuted in the name of the BFFS claim holder (rather than in the name of the holder of the underlying tort judgment, and rather than in the names of both). I also assume that the parties may agree that the holder of the underlying tort claim may provide the attorney to act in behalf of the BFFS claim holder, while prosecuting the claim in the name of the BFFS holder. And, of course, a judgment for BFFS, once obtained, is absolutely assignable as property; or, as stated above, the net proceeds of the judgment may be paid pursuant to an agreement.

But if there is a purported assignment of an unliquidated personal tort claim for BFFS, any punitive damage claim against the insurer will be brought by a party (the underlying plaintiff) who often will not be able to show that the insurer's bad faith caused *him or her* any damage (because, *e.g.,* ninety per cent of $5.8 million is far better compensation than the $50,000 policy limits). When one couples the fact that here Davis presented no evidence of damage (other than the inference of possible damage to his credit or reputation from the fact of the underlying judgment) with the fact that the Johnsons arguably had *no* damage from Allstate's bad faith, one has

---

7. There have been cases where the courts avoided the issue of assignability of a BFFS claim, rejecting a purportedly assigned claim for reasons other than non-assignability. *See, e.g., Stone v. Farm Bureau Town & Country Ins. Co. of Mo.,* 203 S.W.3d 736, 748–49 (Mo. App.2006) (assignment of the BFFS claim was rejected because the court concluded that the insurance policy had been cancelled; no discussion whether a BFFS claim is assignable); *Bonner,* 899 S.W.2d at 928 (rejecting claims as not legitimate BFFS claims).

a scenario for a punitive damage claim that could raise unanticipated legal implications.

A reviewing court may occasionally act *sua sponte* in cases involving substantial punitive damage awards where there is plain, obvious error (though unpreserved) and a resultant manifest injustice or miscarriage of justice. *See, e.g., Duvall v. Maxey,* 249 S.W.3d 216 (Mo.App.2008). This is not such a case. With the law in its current state, I cannot say that the trial court was obligated to intervene here to avoid plain, obvious error. I also understand Allstate's failure to raise a challenge in this regard. It appears to me, though, that, when properly preserved, the issue of the assignability of BFFS claims may be ripe for adjudication.

The court's opinion properly disposes of the issues argued on appeal. I write simply to say that the propriety of the procedures employed in this case do not, under the current status of Missouri law, seem so "cut and dried" to me as to set forth a roadmap for attorneys in future litigation.